*1824.*

*APTHORPE*
*v.*
*COMSTOCK.*

---

## THE NORTH RIVER STEAM BOAT COMPANY

### v.

### JOHN. R. LIVINGSTON.

Navigation is subject to the control of the laws of the United States, not directly as such, but only as an instrument of commerce, or as an object of taxation.

Laws of the United States, having a complex operation upon revenue, commerce and navigation, are to be construed with reference to the main object of those laws, under some one of the powers granted to congress, and to the question, whether they are intended as direct regulations, either of revenue or of commerce; or, whether they affect either of those objects in a consequential and indirect manner only.

The act of 1793, regulating the coasting trade, is a body of provisions resting in some measure, upon each of the different powers of congress to collect duties and imposts, to regulate commerce with foreign nations, and to regulate commerce among the states.

One great object of that law, was to confine the coasting trade to vessels owned by citizens of the United States, and to exclude foreign navigation.

The coasting trade may be, and is carried on, both by registered vessels which have no license, and by vessels enrolled and licensed; but the duties are so regulated as to confer an advantage on the latter; and this advantage together with the exclusion of foreign vessels, is the privilege intended by law, in favor of licensed vessels.

The enjoyment of this privilege, the security of the tonnage duty to government, and the guarding of the revenue laws against evasion, are the objects of the laws for the regulation of licensed vessels. But these regulations are limitations of a pre-existing right, and not a grant of any right or authority to carry on the coasting trade.

Registered vessels which have no license, participate in this trade.

What is the coasting trade, is not in terms, defined by these laws, nor in the license; and the definition is only to be gathered from the restrictions in the

*1824.*
*May 3.*

*Constitutional law.*

1824.

laws. But it is a trade, the right to which was not given by those laws; the right was perfect before, and is only regulated by them.

Laws for the collection of revenue, do not give rights except to the government. On the citizen they operate only as restrictions.

The law regulating the coasting trade, considered as operating to confine the navigation to citizens, and to protect the revenue, is not in conflict with the exclusive grant made by this state to Livingston and Fulton, for navigating steam vessels. Those steam vessels are equally subject to the regulations of the coasting trade.

So far as the law regulating the coasting trade, rests upon the power to regulate commerce among the states, it is inoperative as regards the internal commerce of each state; and the exclusive grant to Livingston and Fulton, being now reduced by the decision of the supreme court of the United States, to the limits of the purely internal commerce, there is no longer any collision.

State laws operating directly upon legitimate subjects of state regulation, but which at the same time, indirectly and consequentially, affect other states, do not therefore, so affect the commerce among the states, as to encroach upon the powers of congress to regulate that commerce.

But if the law regulating the coasting trade, is considered as a revenue law, it may then operate for that purpose, upon the purely internal trade; and if it affects commerce among the states, it is only indirectly and consequentially.

And thus understood, it is not incompatible with any state law : both laws may operate upon the trade at the same time, and neither excludes the other. Steam vessels may navigate under the exclusive grant; but they must also conform to the laws of the United States.

The right to navigate from state to state, under the laws of the United States, and the exclusive right to navigate from port to port within this state, under the state grant, must both have effect, so far as they are compatible : and when not so, the state right must yield.

A steam vessel having a license, and entering this state from another state, may proceed to any port in this state, and may depart from any port in this state, to another state; and in either case, may touch at any intermediate port in this state.

The navigation which thus remains subject to the state grant, is not affected by the limits of revenue districts ; nor by the regulations regarding ports of entry and delivery.

The termini of the voyage, fix its character as respects its being subject or not, to the state grant ; and thus a steam vessel by touching at a port in another state, may be enabled to continue her voyage within this state; and the intention with which such vessel may have touched at the port of the other state, can not destroy her absolute right thus to navigate within this state.

In this case, the defendant's steam vessel, the Olive Branch, having touched at the city of Jersey and landed goods and passengers, had a right to proceed from thence to any port in this state ; and though the waters of the Hudson to the shore of New Jersey, are within this state, yet touching there and so trading, are an intercourse in the only manner there practicable, and the case is substantially a case of navigation from state to state.

1824.
May 3.

Constitutional law.

AFTER the decision of the cause of Gibbons v. Ogden, in the supreme court of the United States, the defendant in this cause, equipped a steam boat called the "Olive Branch," which he caused to be duly enrolled and licensed, under the laws of

the United States for that purpose, and with which he pro-
ceeded from the city of New York to Albany, touching at
Jersey, as hereafter mentioned.

The complainants now filed their bill in this court, grounded
upon the several acts of the state legislature for securing to
certain persons, the exclusive right of navigating the waters
of this state with steam boats ; and praying for an injunction
against the defendant, to restrain him from navigating those
waters with the " Olive Branch."

[The judicial history of the important controversy which has
arisen under these acts of the legislature, will be seen by refer-
ring to the several reported cases in which the statutes are cited,
and in which the rights claimed under them, have come under
the consideration of the courts, viz. ; Livingston v. Van Ingen,
9 John. 507. Gibbons v. Ogden, 4 John. ch. 150. Liv-
ingston v. Ogden and Gibbons, 4 John. ch. 48. 94. and Liv-
ingston v. Gibbons impleaded with Ogden ; Livingston v.
Tompkins, 4 John. ch. 416. 571. 5 John. ch. 250. The
North River Steam Boat Company v. Hoffman, 5 John. ch.
300 ; and Gibbons v. Ogden in error, 17 John. 488. The
arguments in the supreme court of the United States, with the
decision on the writ of error in this last cause, are reported by
Mr. Wheaton in his 9th volume, p. 1.]

On application for an injunction, the chancellor had directed
notice to be given to the defendant, and appointed this day
for the motion. The question was now argued by Messrs.
Oakley and Emmet, for the complainants, and Messrs. Haines,
Henry and Van Vechten, for the defendant.

Mr. Oakley opened the bill without any detail of its con-
tents, observing, that it contained the general statements made
in former bills upon these rights, and referring to the general
and well known history of the controversy. He was proceed-
ing with his argument, when Mr. Henry interposed, to lay
before the court the enrolment and license of the " Olive
" Branch," under the laws of the United States and the bond
executed accordingly. He also read an affidavit of the mas-
ter of the boat ; " that he is a citizen of the state of New-
" York, and that on the voyage in question, he had on board,
" two boxes of goods upon freight for Jersey and Albany, and

" also passengers for hire, for the city of Jersey, where he " touched and landed some of them; his said boat being then " fast to the wharf."

Mr. Oakley. The complainants come here in vindication of rights as long and uniformly enjoyed, and as well confirmed, as any that are held under the government of the state. Those rights have been established not only by a series of statutes, but by the uniform decisions of all our state courts, and particularly by that of the last resort.

The supreme court of the United States, has certainly, a power finally to decide this question; but only so, if the decision below be against the validity of the right, which is claimed under the federal constitution and the laws of congress. This appears to be a strong reason why this court should grant the injunction prayed for, inasmuch as the decision of the court, if against us, can not be revised in the supreme court of the United States.

We suppose, that where there has been a uniform and settled course of decisions, in support of any right claimed under the state authorities, the state courts will continue that course of deciding, except so far as they may be expressly overruled, by the supreme court of the United States. If that court has not occupied the whole ground, this court will as to the residue, persevere in their former course. This very important rule has already been fully recognised by the supreme court of the state, in the case of Mather v. Bush, 16 John. 233. The principle is, that the state court will not go a step, in advance of the supreme court of the United States, in overruling a state law.

The case of Ogden v. Gibbons, was that of a steam boat belonging in New Jersey, going from that state to a place within the state of New York. The present case is, that of a steam boat belonging in this state, and going from one place to another within the state. Both termini of the voyage, are within the jurisdiction of this state.

An adjudged case is strictly an authority, only when the facts are the same; but in giving opinions, courts often indulge in illustrations, or embrace points not strictly called for by the facts upon the record. This is prejudging those points

In the simplicity of early times, when reports were less numerous or less diffuse, the courts looked only to the pleadings, and the judgments, in estimating the authority of a decision, and they still may and ought to reject, as uncalled for, all that the record does not warrant. So also the decree as drawn up, may go beyond the opinion ; but still it must be confined in its authority as a precedent, to the facts in the cause. When the decree says " that so much of the several laws of the state " of New-York, as prohibits vessels licensed according to the " laws of the United States, from navigating the waters of " New York, by means of fire or steam, is repugnant to the " constitution and void ;" the decision must be confined to the facts of the case then before the court. The real question is, what was the decree of the court of errors ? for the supreme court have truly decided no more than, that, that decree " is " erroneous and ought to be reversed." But the case on which the decree was made, was the case of a voyage commencing in one state, and terminating in another ; and the effect of the decision is therefore, necessarily confined to the case of a voyage between different states, and can extend no further.

The powers of congress in relation to this subject, are, " to regulate commerce with foreign nations, and among the " several states, and with the Indian tribes." Beyond this their powers can not be extended, and the chief Justice admits, that all other powers are reserved.

The word " among," as applied to several states, means the same thing with the word " between," as applied to two ; but it is among the states ; not the people of the states. It is the commerce among the states as independent territories, which is granted to congress ; and the power was intended merely to secure the right of the commercial intercourse, from the territory of one state to that of another ; but the regulation of the completely interior commerce of the respective states, is not granted at all to congress. This commerce is that which begins and ends within the state, whether it be carried on by land or water. The regulation of trade in either case, is not confined to that which is carried on by water, and in point of fact, congress have regulated the trade by land carriages, on the Canadian frontier.

The right to regulate navigation is not as such, among the general powers of congress. It can only be lawfully exercised as ancillary to the regulation of commerce, as means to an end; and can go no farther than the fair extent of the principal power. The opinion of the chief Justice disclaims all power to regulate the " completely internal trade." The power of the state therefore, over that trade is exclusive, as well as sovereign. That such a power can not be taken away by implication, is maintained in No. 44 of the Federalist; a work which may be considered a text book of constitutional law.

Before a court will set aside a statute, enacted by a state sovereignty, it must be clearly satisfied, that the state has exceeded its power

The opinion of the supreme court decides these four points.

1st. That the power to regulate commerce, implies that of regulating navigation.

2d. That the power to regulate commerce among the states, is not a concurrent and at the same time a controlling power, but is exclusive in the general government.

3d. But even if the power were concurrent, congress have acted under it, and have made regulations which must prevail.

4th. That the carrying of passengers is a branch of commerce. This point we admit, was argued, though it was not in the case. The supreme court say, " It is not intended to " say, that these words comprehend that commerce which is " completely internal; which is carried on between man and " man in a state, or between different parts of the same state; " and which does not extend to or affect other states."

Here then, is a disclaimer of any power over the trade between man and man in the same state, and between different parts of the same state. This must then mean between each part and every other part. The meaning must also be, that if the voyage is extended to another state, for example to Philadelphia, then it comes within the power of congress; but it could never be meant to say, that if the regulation should affect another state in some indirect and remote manner, the case should therefore come within the power of congress. This

would subvert all state power over the subject, and destroy the state authority by implication.

But in another part of the opinion the court say, " If con- " gress license vessels to sail from one port to another, within " the same state, the act is supposed to be necessarily inciden- " tal to the power expressly granted to congress, and implies " no claim of a power to regulate the purely internal trade of " a state, or to act directly on its system of police." If this is no claim of a direct power, what is it? If congress can not do this directly, can they do it indirectly? and is not this a case of assuming powers by implication?

What is the consequence of this claim of indirect power? If it is rightful, it applies to the land as well as the water; for there is nothing peculiar in navigation. Congress may then, come within each state, and regulate all the transactions of mankind as incidental to their general power. Roads and canals will be embraced in it; waggons may be required to have licenses, and to enter and clear out like ships. The trade between town and town, and man and man, would come within its scope. It has even been contended, that the laws of bills of exchange and promissory notes, are matters of congressional regulation, because they are means of commerce. The same would apply with equal propriety to all health and inspection laws, and to all that affects the intercourse of mankind.

When the state courts are not leading the course of decisions on this subject, but following, it becomes more especially proper to insist on state rights, till compelled to recede by superior authority, and by the legitimate exercise of the powers of the general government. These considerations bring me to a proposition, which we think can be established. It is " that " all those acts of congress which regulate trade within the " states respectively, are beyond the power of that government and void." It is no objection that congress have acted on a different principle.

The practice under the constitution has been very different from what was intended, at the time of its adoption. 1 Tucker's Blackstone 250, appendix D.

What was the evil in the former state of things, which the

constitution was intended to remedy? It was, that one state laid duties upon another, by taxing importations. The remedy was to regulate trade between the states, as such, and to save them from unequal burdens; but when once goods are brought within a state and deposited, the power of congress over them ceases. The real coasting trade, which the constitution intended to regulate, goes no further; but congress have gone on to cover the surface of the Union with regulations. They have embraced the lakes, lost sight of the distinction of states, and amalgamated all in their legislation.

The internal commerce of the states, must be preserved in practice and effect. All the legitimate powers of congress may be exercised without affecting it, and if so, there is an end of the indirect power.

The defence to this bill is, that the "Olive Branch" is enrolled and licensed, and that she landed one or two packages of goods at Jersey. It is obvious however, that this trade to Jersey is but a pretence.

The real intention is plain, and is well known to be, to carry on the direct trade from New York to Albany. The fact however, is not sufficient to justify even that pretence. The entire water of the Hudson is within our state jurisdiction, 4 John. ch. 51.; and by the laws of the United States, 4 vol. 346, Jersey is made a part of the port of New York, and an assistant collector is to be appointed in it.

The language of the act of congress in defining the limits of the districts in New Jersey, is peculiar, and was probably adopted by the first secretary of the treasury, in reference to the known claims of New York to the waters of the Hudson and of the bay. The act says, that "the district of Perth-"Amboy shall comprehend all that part of the state of New "Jersey, known by the name of East New Jersey, together "with all the waters thereof, heretofore within the jurisdiction "of that state." 2d vol. laws U. S. 135. 3d vol. 142, sec. 7.

There were then, no waters for the boat to float in, except those of this state; and the colorable voyage to Jersey will not be regarded.

Mr. Haines on the part of the defendant.

The questions naturally submit themselves to the court;

1st. Can the State of New York regulate trade and commerce on the Hudson river, between New York and Albany? 2d. Does the opinion of the supreme court of the United States, in the case of Gibbons v. Ogden, leave the state of New York in the possession of that sovereign power, that embraces the regulation of this trade and commerce?

Previous to the discussion of those momentous questions, it is well to notice some preliminary considerations. The circumstance that steam boats are generally devoted to the transportation of passengers, is no longer entitled to weight or notice. Nor, in fact, have we any thing to do with steam boats in this argument; they are now identified with the coasting marine of the United States, with sloops or other vessels which have licenses under the laws of the United States, to prosecute the coasting trade. So the supreme court has decided.

It is unnecessary to spread before the court the various laws which have been enacted by the legislature of the state of New York, in relation to steam boats. A simple and comprehensive abstract is sufficient. The state of New York, then, has passed a series of laws, by which certain individuals have the sole and exclusive right of navigating the river Hudson, with every kind of vessel propelled by fire or steam, for the space of thirty years. The laws of congress enact, that any vessel having a license under the authority of the nation, to carry on the coasting trade, may navigate the waters of the United States, and among the rest, the waters of the river Hudson; and the supreme court of the United States has decided, that steam boats may have such license and permission.

It must be apparent, that if the state of New York can exclude steam boats, when duly licensed according to the laws of congress, from plying between New York and Albany, she may in virtue of the same authority, prohibit any and all vessels from sailing in the waters of the north river, notwithstanding their being enrolled and licensed. The first question then, is that which relates to the power of this state, to regulate trade and commerce on the river Hudson, between the city of New York and the city of Albany.

When the constitution of the United States was framed, the members of the convention among other purposes, had two

great objects in view; commerce and revenue. The former was by far the most important of the two. When the convention assembled, its debates, as far as our knowledge at this distant day, reaches them, prove it. The debates of the different state conventions, called to promote the adoption of the constitution, and the very able and luminous writings which preceded its sanction by the American people, conspire to bring us to the same conclusion. What then do we find in the constitution itself? We find that congress has power to regulate commerce, not only with foreign nations, but among the several states and with the Indian tribes. Art. 1. § 8. We find, that no preference shall be given to one state over the ports of another state; and that no state shall impose a tonnage duty, lay imports or duties, or imports or exports. Idem § 10. From all these considerations, it is perfectly evident, that when the constitution was formed and adopted, a broad natural commercial system was contemplated, independent of state legislation. It was to embrace foreign and domestic relations; it was to be internal and external in its operations; it was to include our trade abroad, and our trade at home. Wisdom and uniformity were to be its permanent features.

If these views be sound, let us approach another inquiry; what was to be the extent of this commercial system, when applied to the trade and commerce of the several states? It was to pervade the waters of the union. It was to embrace all trade and commerce prosecuted on the waters of the United States, that could require general regulation. What are the waters of the United States? They include the sea coast, bays, harbors, inlets, estuaries, and certainly the great rivers open to the sea, where the tide ebbs and flows; rivers, which in fact, are arms of the sea, and to many legal purposes, the sea itself. Any other national system of commercial regulation, would be absurd. Any other line of distinction would lead to error, to confusion and to discord.

We perceive, that congress has passed three acts entitled to much consideration in the argument of this case: 1st. An act passed Sept. 1, 1793, for registering and clearing vessels, regulating the coasting trade, and for other purposes; 2 vol. L. U. S. p. 35. ed. 1815. 2d. An act passed Feb. 18th,

1793, for enrolling and licensing ships or vessels, to be employed in the coasting trade and fisheries, and for regulating the same ; Idem p. 332. And lastly, an act passed March 2d, 1790, to regulate the collection of duties on imports and tonage. 3d vol. L. U. S. p. 136. Taking these three acts together, we shall see that congress has covered the whole ground. They embrace our foreign trade, our coasting trade and our fisheries. They constitute a complete system of regulations.

The Steam Boat Company v. Livingston.

We have no concern here with any thing but the coasting trade. And is it not one of the most evident things which can appeal to the reason of man, that at the time of the convention of 1787, and at the period when the acts which I have mentioned, were passed to regulate the coasting trade, that state lines and state boundaries, were wholly out of the question ? A vast internal, or home trade was in contemplation. Those wise and illustrious statesmen who laid the foundation of our political institutions, well knew the importance of interior trade and exchange, and our natural capacity for their prosecution. They saw a sea coast stretching from New-Orleans, to the borders of the St. Lawrence, a lake coast of nearly two thousand miles, many noble and commodious harbors along these coasts, magnificent bays indenting our shores, and our country variegated by deep, broad, and majestic rivers. The fertility of our soil, and the hardy enterprise of our population, did not escape their recollection. To secure the permanent prosperity of this trade, regulations were deemed necessary. That these regulations should be uniform and supreme over all the waters of the United States, and that they should be essentially national, was also thought to be vitally important. The exercise of state authority in the shape of clashing and hostile regulations, was justly dreaded and concluded. All state power was therefore absorbed, in the national grant.

The convention of 1787, did not consider itself as acting for the states. The powers of this convention came from the people. The very first words in the constitution, are, " We the people." The national government, says chief Justice Marshall, in so many words, was not carved out of existing state sovereignties ; it was the offspring of the people's choice, coming direct from them. Martin v. Hunter's lessee, 1 Wheat.

304. When the constitution says, that congress shall have power " to regulate commerce among the several states," we are not to treat this as the language of limitation. It is not a saving clause to the states. It is a power to regulate commerce among the PEOPLE of the states. It is not saying, that congress shall merely prescribe here certain bodies politic; certain artificial beings, shall carry on a commercial or trading intercourse; the authority imparted is, to regulate commerce whenever it may be found within the compass of our national domain. It is the subject matter of regulation that we are to consider; and whether this subject matter be crossed by this or that state line; whether it spread over a bay or river, that is partly in our state, and partly in another, or wholly in a single state, makes no difference; while the subject matter of regulation, commerce, preserves its identity, it comes within the scope of national power; whenever the term STATE is used in the constitution, it is synonymous with the people of a state; and we find in the 10th article of the amendments to the constitution, where state power is expressly reserved and protected, that the words are " the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." What people? The people of the states. Again : " The enumeration in the constitution of certain rights, shall not be construed to deny or disparage others retained by the people," not states. The power to regulate commerce is certainly a national power; and a national power to be interrupted, broken, or limited by state lines, is no power at all : it is a name without a substance. I deem the power for which I am contending, an entirety. If New York, Pennsylvania, and New-Jersey, should change their boundary lines, is the power to regulate commerce entrusted to congress, to be changed or varied ? It is contended here that the words, " among the states," limit the power to regulate commerce to voyages commencing in one state and terminating in another. If there is no commerce to regulate, except what may grow out of such voyages, this novel construction may be sound; but not otherwise. It owes its origin to the steam boat controversy.

It was not dreamed of in 1787, and will never be dreamed of again when this great controversy finds an end.

If any portion of the waters of the United States facilitate the purposes of trade and commerce, the waters of the Hudson are subject to national legislation. The Hudson is to all intents an arm of the sea. Its mouth forms one of the finest harbors in the world. It is open to the flow and reflow of the ocean. The whole union is interested in its commerce. It is that broad and deep stream which, with the aid of works for artificial navigation, is to connect the Atlantic Ocean with our inland seas. The waters of the Hudson properly belong to the authority of the sovereign power; let that power be where it may.

Conceiving that the power to regulate commerce on the river Hudson, is reposed in congress by the constitution; the next important inquiry is, what has congress done? For more than thirty years it has regulated commerce on this river, and it is to the judicial boldness and ability of a recent period that we are to look for the denial of its power so to do. By the act of 31st July 1789, 2 vol. L. U. S. p. 10. we find the state of New York divided into two districts; and to shew the sense of congress, two years after the constitution was framed, it may be well to attend to the provisions of the act. Sagg Harbor on Long Island, was made one district; the city of New York, another. The district of Sagg Harbor, is a small part of the Long Island coast. The district of the city of New York included the residue of the state and among other places New Windsor, Newburgh, Poughkeepsie, Esopus, city of Hudson, Kinderhook, and Albany, were ports of delivery only; and all ships or vessels bound to or from any port of delivery, within the last mentioned district, were obliged to come to, and enter or clear out, at the city of New York. The act of 2nd March, 1799, 3d vol. L. U. S. p. 137. by which the act of 1789 is repealed, makes some change in the division of the state; but the district of the city of New York is made to embrace coasts, rivers, bays, and harbors; the various landing places on the Hudson are enumerated, and Albany is made a port of delivery. It may now be well to recur to the act of Sept. 1789, 2d vol. L. U. S. p.

35., passed two years after the formation of the constitution, when many of the very able men were legislators who were instrumental in framing this same constitution: which act was passed for registering and clearing vessels, regulating the coasting trade and other purposes.   Here we find that any coasting vessel, and consequently any steam boat, having a coasting license, is not only entitled to go from port to port, in different districts, but from port to port in the same district, and from port to port in the same state.   § 27.   By the act passed Feb. 18th, 1793, for enrolling and licensing ships or vessels to be employed in the coasting trade and fisheries, and for establishing their regulation.   2d vol. L. U. S. p. 332.   We find state lines, as in the former act wholly disregarded.   The coasting trade is viewed as one great whole; as a unity.   It was considered, in a geographical point of view, as extensive as the sovereignty of the nation.   By the act of the 2d of March 1799, to regulate the collection of duties on imports and tonnage, 3d vol. L. U. S. p. 136, we find the city of New York including all such parts of the coast, rivers, bays, and harbors, as are not before embraced by an other enumeration in the same act.   Albany is made a port of delivery; the city of Hudson, on the north river, is made a district to comprise the waters and shores of the city, or, in other words, the waters and shores of the river Hudson.   This same act establishes districts on the St. Lawrence, on the Lakes, on the Delaware river, on the Mississippi, and on the various bays, rivers, creeks, and estuaries of the United States.   By recurring to the act of Feb. 18th, 1793, already mentioned, and paying particular attention to the 6th, 14th, 15th, 16th, and 23d, sections, and even many others might be mentioned, we find, that the character of the legislation on the part of congress is left destitute of doubt or ambiguity.   The 6th § speaks of navigation between different places in the same district, and of course, between New York and Albany.   Sections 14th and 15th make use of the term, navigable river, and § 14th speaks of a district on a navigable river.   The Hudson falls under this description.   When any species of vessel, has a coasting license under the laws of the United States, she can go from district to district, where each is situ-

ate in different states ; she can go from district to district where both are situate in the same state ; and she can go from port to port, where they are both in the same district, and in the same state. I have before said, that state boundaries had no relation to the coasting trade. In illustration of this doctrine, the fact that some parts of different states are thrown into the same district, strikes us with much force. New York, New Jersey, New Hampshire, and Maine, present instances of this description.

The course of national legislation is therefore plain. From the adoption of the government to this day, congress has regulated commerce on the river Hudson. It has for more than thirty years, regulated commerce between the city of New York and the city of Albany. Can it, and will it be seriously denied, that congress has power to constitute the city of Albany a port of delivery? And yet concede this, and no more need be asked. That congress can constitutionally render New York a port of entry and delivery, is conceded. If Albany then, can be made a port of delivery, it follows as an inevitable result, that the trade and commerce between these two places can be regulated by national authority.

In the construction of all great political instruments, usage is entitled to some consideration. Since the organization of the American government, commerce has been regulated by the national government on all the waters of the Hudson. This was done in the days of ALEXANDER HAMILTON, chancellor LIVINGSTON, and above all during the days of GEORGE CLINTON, who was ever vigilant in watching for any encroachment on the rights of the states. The power here spoken of, was never questioned till this day.

It is not in the nature of sovereign power to be divisible. It is every thing or nothing. Either the general government is sovereign on the river Hudson, for all purposes named in the constitution, or the state of New York is sovereign. There is no partnership. Nor is there any concurrent power. It has been decided that when congress in some cases omit to exercise a right contained in the constitution, this right may be exercised by the states. Sturges v. Crowninshield, 4 Wheat. 122. But it is far different here. Congress has exerci-

1824.        sed this right.  It has exhausted the privileges of the grant.
            The state of New York can not come in by a non user on the
The Steam   part of the national legislature.   The counsel for the com-
Boat Com-
pany        plainants in the bill, are urging the court to the adoption of
v.          doctrines and principles equally bold, novel and dangerous.
Livingston. It is not the laws of the state of New York which are now at
            issue ; it is the laws of the United States.

The inconveniences of the confused and vague construction of the constitution contended for on the other side, would indeed be numerous.   It would destroy all idea of an entire commercial system.   The home trade of the United States would be under the direction of the sovereign·authorities ; that of the states and that of the nation.   There would be two sets of laws, two classes of officers, and these too often arrayed in hostility to each other.   It draws an odious distinction between the citizens of our own state, and the citizens of any other state ; be-- cause the argument grants, that the state of New York can pass no laws by which the citizens of New Jersey can sail from Perth Amboy, or any other port in New Jersey, to the port of Albany ; but then it denies that the citizens of New York, can navigate from New York to Albany, without a license from the state, although they have the same description of coasting licenses under the laws of the United States.   Of what benefit can it be to the state of New York, to establish a system of commercial regulations on the waters of the Hudson, that every coasting vessel in the Union, passing the New York lines, may break through with impunity ?   This doctrine is wild in another sense.   The city of New York is becoming to this continent, what London is to the other, the grand centre of capital and exchange.   When the lakes are connected, as they will be in a few months, with the Atlantic ocean, by the western canal, it may be a great object for coasting vessels to bring cargoes to the city of New York, land them there, and proceed to Albany, Troy, or elsewhere within our waters to take other cargoes.   The successful and free prosecution of the coasting trade, might require this.   Our salt, our gypsum, our wheat, and perhaps our iron and coal at a future period, may render such voyages common and desirable.   But say the other side, the constitution permits no such voyages.   The very borders

of the city of New York communicate a constitutional disability. Already we have our lines of packets from New York to the great seaports of France and England. A few years may produce the establishment of lines from New Orleans or Charleston, to the Canadas, or to the great places on the lakes, by way of New York and the Hudson. But if one of these packets should stop at the city of New York and increase or diminish her burden, her voyage, according to the constitutional principles now advocated by the opposite counsel, becomes illegal; and the whole intercourse might be arrested by such landing. Was such a state of things anticipated by the convention of 1787? Another absurdity appears as we pursue this investigation. The state of New York, we are informed, can interdict all navigation directly carried on between New York and Albany, whether vessels be licensed or not; but a vessel with a coasting license, may proceed from Elizabethtown point to Albany: this is constitutional. Then suppose the same vessel leaves New York, goes to Elizabethtown point, and from thence to Albany: this would also be constitutional; but if the same vessel should wish to avoid circuity and proceed in a direct line to Albany, this we are gravely told would be violating the constitution, and invading the principles of the confederacy.

It is said that the words " among the several states" mean from state to state; a commerce where the voyage begins in one state, and terminates in another. Of what consequence then, is a coasting license? Or what have we to do with ports and districts? Jersey city, opposite to New York, belongs to the state of New Jersey, but it is included by a law of congress, in the district of the city of New York. If a vessel proceeds from Jersey city to Albany, she goes from state to state, and this would be what is here defined to be the true commerce intended by the constitution. Now the whole of this reasoning is refined, subtle, and profitless. It is rendering the constitution a useless instrument, at war with the purposes of its authors, and with the intentions of the American people who adopted it.

The positions laid down by the counsel on the other side would, if sound, lead to two bold results: first, it would enable every state in the Union to establish commercial or trading

1824.

The Steam Boat Company v. Livingston.

monopolies on its waters. One state might close the Missis-sippi ; another, Chesapeake bay ; another, Boston bay ; anoth-er, Albemarl sound ; and as for the state of New York, she might draw her chains across Long Island sound and the river Hudson. These great highways, which are national waters, if there be waters pertaining to the nation any where, and which under all regular governments would belong to the sovereign power, might be used to gratify the ends and cupidi-ty of speculating associations, growing up under acts of state legislation. Secondly, it enables the state of New York to grant to a single individual or to any company of individuals, the sole and exclusive right of navigating the waters of the river Hudson from Albany to New York, with any kind of vessels, for the space of thirty years, for the space of one hun-dred years, or for all ages.

If New York can regulate commerce on the river Hudson, and if the regulating power of the general government is ex-cluded from these waters, then the state of New York may lay an embargo on the Hudson. Virginia may lay one to affect trading and commercial intercourse in Chesapeake bay, and we may have fifty state embargoes at the same time. The authority to lay an embargo has been always exercised by the general government, not as a war, but as a commercial power. So says chief justice Marshall. If the states can lay embargoes for commercial purposes in war and in peace, when commercial treaties exist and when they do not exist, it is not for any man to say where the exercise of such a power on the part of the states, might end in its consequences. But the constitution has intended to place the citizens of all the states on the same commercial basis ; the basis of equality. So it declares that " the citizens of each state shall be entitled to all the privile-" ges and immunities of citizens in the several states." Art. 4, § 2. Con. U. S. This applies to the rights of commercial intercourse as well as to any other rights.

But one question need be decided. Congress has regula-ted commerce on the river Hudson. It has said, that any vessel having a coasting license may navigate the waters of this river from New York to Albany. The whole Union, since the constitution of the United State went into existence, have

deemed the laws thus regulating this commerce, constitutional. So have all our courts, national as well as state tribunals. There have been revenue seizures under such laws for thirty years past. The supreme court of the United States, has recognised them. Is the court of chancery of the state of New York, now prepared to decree their abrogation? Is this tribunal prepared to declare them contrary to the constitution and void? This decides the whole controversy. It is unnecessary to cast a single glance on the statutes of the state of New York granting what is called, the steam boat monopoly. The question reaches things of a higher import.

II. We now come to the second grand inquiry, in this argument: Does the decision of the supreme court of the United States in the case of Gibbons v. Ogden leave the state of New York in the possession of that sovereign power, that enables her to regulate commerce on the river Hudson, between New York and the head waters of navigation?

It is to be regretted that the opinion of the supreme court of the United States in the case of Gibbons v. Ogden, has left any room for doubt, even with the counsel for the complainants. Their minds, powerful and acute, have seized on certain expressions of the opinion pronounced by chief justice Marshall, and would lead this court to believe, that the sovereign power of New York, over the waters of the Hudson is confirmed. The examination of this decision therefore, becomes necessary; and some rules of construction are respectfully submitted : First, we are to reconcile the opinion with itself, or all its parts with each other, if it be practicable ; secondly, we are to view it as a whole, as an entire production, and not take some parts without other parts; thirdly, we are to view the decree as the conclusion of the court drawn from premises previously laid down ; fourthly, we are to pay a regard to the principles on which the decision rests.

In drawing the line between that commerce which is to be regulated by congress, and that which is not the subject matter of such regulation, the supreme court has made use of several terms, which are much insisted on in favor of the prayer of the bill, in this case. The commerce to be regulated, it is said, in the opinion, " may be restricted to that commerce which

"concerns more states than one"; that it does not affect "the completely interior traffic of a state"; that something is excepted in the powers granted to the general government, and that "that something must be the exclusively internal commerce of a state." It is declared that "those concerns "which are completely within a particular state; which do "not affect other states," may be left to the states, and that "the completely internal commerce of a state may be reserved "for the state itself." These expressions are selected as being those of the most decided type in favor of the North river steam boat company. And taking them alone, and unconnected with any other portion of the opinion, they are perfectly susceptible of a simple explanation; an explanation that by no means proves the laws of the United States already cited, unconstitutional. When we speak of a trade or commerce interesting to more states than one, we must mean interesting to the traders; to the people of more states than one; for the states are not trading corporations nor commercial bodies. The word state is nomen generalisimum; a generic term of convenient use. All that the supreme court says then, is this; that commerce, or the commerce of those waters which is so partial, so inferior in its character, and so confined in its operations, that it is wholly immaterial to the American people how it is regulated, or under what municipal restraints it is placed; may be left to state police, and state legislation. But is this the case with the trade and commerce of the river Hudson? Does it not concern the people of more states than one? Is it a matter of no concern to the people of New Jersey, Connecticut, Pennsylvania, Massachusetts, and other states, whether the river Hudson is open or not? Does it follow, that all voyages in vessels from other states, must terminate at the port of New York? The coal mines of Pennsylvania are daily growing in importance. They may yet supply the villages on the North river, and the same vessels that transport fuel to increase the comforts of life, may return with cargoes of salt and gypsum, thus answering different wants by mutual exchange. Flourishing trading towns will appear in the interior of this state, and great manufacturing places will rise up. Albany, Troy, Lansingburgh

-and Waterford will constitute extensive depots. Does it not

then concern all the states of the Union, to keep open an arm of the sea, like the Hudson, for the purposes of trade? Can the traffic in such waters be called completely internal? There may be such a traffic. It may be found between man and man, between village and village, between place and place, where not a ton of shipping can ever be employed. The terms of qualification found in the opinion of the supreme court, may have their full operation and be taken in their natural import, and still leave the commerce of the north river untouched.

This conclusion will be more palpable and satisfactory, when we recur to other parts of the decision in the case of Gibbons and Ogden. "It is obvious," says the court, "that "the government of the Union in the exercise of its express "powers; that, for example, of regulating commerce with for-"eign nations and among the states; may use means that may "also be employed by a state in the exercise of its acknowledged "powers; that, for example of regulating commerce within the "state. If congress licenses vessels to sail from one port to "another in the same state, the act is supposed to be necessarily "incidental to the power expressly granted to congress, and im-"plies no claim of a direct power to regulate the purely internal "commerce of a state, or to act directly on its system of police." Again: "It has been contended," says the court at Washington, "by the counsel of the appellant (Gibbons,) that as the word "to "regulate" implies in its nature full power over the thing to "be regulated, it excludes necessarily the action of all others "that would perform the same operation on the same thing. "That regulation is designed for the entire result, applying "to those parts which remain as they were, as well as to those "which are altered. It produces a uniform whole, which is "as much disturbed and deranged, by changing what the "regulating power designs to leave untouched, as that on "which it has operated. There is great force in this argu-"ment and the court is not satisfied that it has been refuted." Further says the court: "the power of congress then, com-"prehends navigation within the limits of every state in the "Union so far as that navigation may be in any manner con-"nected with "commerce with foreign nations, or among the

"several states, or with the Indian tribes." It may of consequence pass the jurisdictional line of New York, and act "upon the very waters to which the prohibition now under "consideration, applies." From these extracts, the following deductions are authorised : 1. That congress may license vessels to sail from port to port in the same state, and of course from New York to Albany, as incidental to powers expressly granted by the constitution ; and that this implies no power to regulate the purely internal commerce of a state : this commerce of a purely internal character, not being a commerce from port to port, like that on the river Hudson. 2. That where there is a power to regulate commerce at all, it embraces the whole thing to be regulated, is a sovereign power, sole, exclusive, and prohibits all interference from any other source of power, though it may not exhaust its own authority in its exercise. If the general government therefore, acts to any extent on the Hudson, however limited, this is an interdict to all state legislation. 3. That the power to regulate commerce may pass the jurisdictional lines of a state, and act on internal waters like those of the river Hudson, if they can in any way be called internal.

We may now pass to the decree pronounced by the supreme court in the case of Gibbons v. Ogden. This is to be taken as the solemn and deliberate conclusion of that tribunal, from all the premises laid down in the opinion. It is the result of grave, patient, and learned investigation. The decree is too plain and comprehensive to be misunderstood, and technical niceties are therefore resorted to. It is said to be too broad ; that it decides more than the case before the court ; that the supreme court could only reverse or affirm the decision of the court of errors of the state of New York, in the case of Gibbons v. Ogden. This objection relates to questions of practice. The supreme court adopts what practice it pleases ; that of the house of lords, exchequer, and the king's bench in England is its outline ; Rules sup. court : but in deciding a great constitutional question, it intends to construe that constitution and to say all that is requisite to prevent future controversy. It is submitted that the decree in question does this. In the case alluded to, Thomas Gibbons, the appellant, owned the two

steam boats, Stoudinger and Bellona. They were enrolled and licensed as coasting vessels. The court decreed that these licenses " gave full authority to those vessels to navigate the " waters of the United States by steam or otherwise, for the " purposes of carrying on the coasting trade; and that so " much of the several laws of the state of New York as pro-" hibits vessels licensed according to the laws of the United " States, from navigating the waters of New York by means " of fire or steam, is repugnant to the constitution and void." What are the waters of the United States ? The former part of the argument has anticipated the answer. The waters of the Hudson are the waters of the United States ; so are those of all other rivers where the tides of the ocean flow and recede. In the various acts of our state legislature relating to grants to the steam boat company, they are termed New York waters. So they are spoken of in the decree. If in consequence of having coasting licenses, the Stoudinger and the Bellona were authorised to navigate the waters of the United States, they were authorised to navigate the waters of the Hudson, from point to point on that river. There is no qualification in the decree. It does not say, that the voyage shall begin in one state and end in another, to make it a lawful voyage. It says, " full authority to navigate ;" and plying from New York to Albany is navigating.

It is said with equal assurance, that the supreme court has not decided the case now before the chancellor. In one sense this is true. But virtually it has decided it. It has laid down principles that as completely settle the present question as any one decision can put at rest future controversies. Why are the doctrines and rules laid down by lord Holt, lord Hardwicke or lord Mansfield, cited at this day ? Because some generations ago, they declared certain things to be law and gave certain legal expositions ; and whenever any case falls within the rules which they promulgated from the bench or the wool sack, it is settled by those rules. They will speak in the same tone of authority through centuries to come. This forms a great part of that broad and firm basis on which rests the fabric of the common law, venerable as it is, and full of order, harmony, and splendor.

A court of chancery will not grant an injunction, where great doubts exist as to the rights of the complainant. The laws of the state of New York which were peremptory on the chancellor, and which absolutely declared that he should grant injunctions in cases of this kind, have been swept away by the decision of the supreme court of the United States. Will any candid mind conclude that there is no doubt? It is said, that if the supreme court has not decided this case, in so many words, this honorable court should be contented to follow, and not be anxious to precede the steps of the tribunal of the last resort. With great deference, it may be said in reply, that this honorable court is bound to support the constitution of the United States. There is an oath of office to that effect. The constitution declares, that the laws of the United States, Art. 4. amend. shall be the supreme laws of the land.

Finally, let the courts of this state pause. For many years, this controversy has kept open the bitter fountains of litigation. One court after another decided, that the rights of the complainants in this case, were sacred. All that learning and all that genius could do, was done in defence of their privileges. The shade of Fulton was invoked in our forums, and the alarm on the subject of state rights and consolidation of the Union, was sounded in our halls of legislation. State pride was roused, and successful appeals pressed upon public gratitude. The zeal of patriotism, and talents, if not of judicial pride, was kindled. The grant, the remnant of which it is now sought to maintain, was carried into that tribunal which the people of America have ordained should construe the constitution. The touch stone was applied, and the test was fatal. There is a well grounded confidence, that this court will pause before it goes further; that it will doubt before it acts; that it will hesitate, and long hesitate, before it decrees.

Mr. Henry on the same side. We had hoped the day had gone by, when the claims of state sovereignty were to be arrayed against the United States, on a purely legal question. This is a case of conflicting laws; and it is unfair to excite state prejudices upon the subject.

When a court of competent jurisdiction, and especially one of the last resort, has decided a question, that decision must

be final; common sense, law, and all writers on law, unite in this. .

By the constitution, art. III. sec. 2d. "The judicial power "shall extend to all cases in law and equity, arising under this "constitution, the laws of the United States, &c." And by the act of 24th of September 1789, sec. 25. " a final judgment or "decree in any suit, in the highest court of law or equity, of a "state, where is drawn in question the validity of a treaty or "statute of the United States, or an authority exercised under "the United States, and the decision is against the validity; or "where is drawn in question the validity of a statute of, or an "authority exercised under any state, on the ground of their be-"ing repugnant to the constitution, treaties, or laws of the United "States, and the decision is in favor of such their validity; or "where is drawn in question the construction of any clause of "the constitution or of a treaty or statute of, or commission "held under the United States, and the decision is against the "title, right, privilege or exemption specially set up or claim-"ed by either party, under such clause of the said constitution, "treaty, statute or commission, may be re-examined and rever-"sed or affirmed, in the supreme court."

What was the decree in chancery, which the court of errors affirmed, and which the supreme court have' reversed in the case of Gibbons v. Ogden? That decree is found in 17 John. 488; and it overrules in terms, the title set up by the defendants, which was in these terms: " And this defendant is ad-"vised, and doth respectfully insist, that the said steam boat "Stoudinger, during all the time that the said license has con-"tinued and been in force, lawfully might, and while the same "shall continue in force, lawfully may be employed under the "same in carrying on the coasting trade : and that the said "steam boat called the Stoudinger, whether moved by steam "or fire, or otherwise, may lawfully be navigated and employ-"ed under the said license, while it continues in force, in any "lawful trade or employment permitted by the laws of the "United States, to vessels licensed to be employed in carry-"ing on the coasting trade between ports of the same state, or "ports of different states, over any of the waters of the United "States, or of any particular state, and can not be excluded

1824.

The Steam Boat Company.

v.

Livingston.

"from the said employment and navigation, or restricted there-" in, by any law or grant of any particular state, or any pre-" tence of an exclusive right to navigate the waters of any " particular state, with boats moved by the force of steam or "fire, or by any other power."

The decree pronounced by the chancellor, in that cause, in May term 1821, and affirmed by the court of errors, was to the following effect : It formally recited the allegations of the parties. " The complainant insisting on his part, upon the " right exclusively to navigate the waters, &c. with boats " moved by fire or steam, &c. and therefore claiming to have " the injunction made perpetual ; and the defendant resisting " the said claim, and calling for a dissolution of the said in-" junction, insisting upon his right to navigate any of the wa-" ters within the limits and jurisdiction of the United States, " with his steam boats, under the enrolments and licenses there-" of, &c. ; and resisting the claim of the complainants, on the " ground that the several acts of the legislature of the state, " were unconstitutional and void ; and it appearing to the " court, that the said several acts are valid, and that the com-" plainant is entitled to the right he claims to the exclusive " navigation of the waters, &c. with boats moved by steam or " fire, and that the defendant can not lawfully navigate the " same with his steam boats, &c., it is further ordered, adjudg-" ed and decreed, that the injunction heretofore issued, in " this cause, be made perpetual."

And in giving his opinion, the chancellor declares, that " every branch of the right and title set up in the answer as " matter of defence, appearing to be without support or validi-" ty, the motion to dissolve the injunction, is consequently de-" nied." 4 John. ch. 164.

And that decree of the chancellor, (after affirmance in er-ror,) was as expressly reversed by the supreme court of the United States, who say in the decree, that " This court is of " opinion, that the several licenses to the steam boats, the " Stoudinger and Bellona, to carry on the coasting trade, " which are set up by the appellant Thomas Gibbons, in his " answer to the bill of the appellee Aaron Ogden, filed in the " court of chancery of the state of New York, which were

" granted under an act of congress passed in pursuance of the " constitution of the United States, gave full authority to those " vessels, to navigate the waters of the United States, by " steam or otherwise, for the purpose of carrying on the coast- " ing trade, any law of the state of New York to the contrary " notwithstanding; and that so much of the several laws of " the state of New York, as prohibits vessels licensed accord- " ing to the laws of the United States, from navigating the " waters of New York, by means of fire or steam, is repugnant " to the constitution and void." The supreme court therefore, have in terms decided; 1st. Upon the validity of the New York statutes ; 2d. upon the validity and effect of the laws of the United States, as to licenses to coasting vessels ; 3d. In direct and immediate opposition to the decree, they reverse the particular grievance, the perpetual injunction, in the par- ticular case.

If the supreme court determine any particular point by their decree, no inferior tribunal can deny it on the ground, that the facts did not authorise the decree. The decree is binding upon all courts, both of the United States, and of individual states. If the decree was wrong, can this court set it right? Can the court whose decree was reversed, sit in judgment upon the reversal?

The decree of this court, was affirmed by the court of errors without qualification. On what was the writ of error brought? On that affirmance. It was within the powers conferred by the law and constitution of the United States on the supreme court.

Thus vested with power, the supreme court of the United States, settle the questions of right and of the validity of the statutes. That right is now denied in the court from which the appeal lay ; for the Olive Branch here stands in the same situation with the Stoudinger and Bellona in the case of Gib- bons. Suppose that decree erroneous ; can it be reversed here ? If not directly, can it be done collaterally ? Stare de- cisis, is a rule which can not be of less authority, when applied to courts of the last resort.

The effect then, of the judgment of the supreme court, is.

1824.  that a license gives authority to navigate every where; be-
tween two ports of the same state, as well as between others.

The Steam Boat Company v. Livingston.

The act however, for the enrolling and licensing of steam boats, passed the 12th of March 1812, contains an implied but conclusive expression of the sense of congress, of the unconstitutionality of state laws, as it provides;

Sec. 1. That a steam boat employed or intended to be employed in a river or bay of the United States, and owned wholly or in part by an alien resident, may and shall be enrolled and licensed, as if the same belonged to a citizen, according to, and subject to all the provisions of the said act for the enrolling of vessels, *except the oath of citizenship.*

Sec. 2. Provides that security shall be given, that such boat shall not be employed on any other waters, than the rivers or bays of the United States.

Whenever any court, ecclesiastical or civil, possesses a competent jurisdiction, the decree of that court is conclusive evidence of that matter, whenever it comes collaterally in question in any court of justice. 3 Esp. N. P. 457. 430, and cases there cited.

The conclusiveness of a judgment or decree of a court of competent jurisdiction, especially in the last resort, can not be questioned, and can not be re-examined in that court itself. 1 Wheat. 355.

But even if this court is at liberty to enquire and determine what use may be made of an enrolled and licensed vessel, it will be found to embrace all the subjects of the coasting trade or commerce, including passengers, domestic and foreign produce, of every kind, and extending not only from port to port in different districts, but from port to port in the same district, and over all the navigable waters of the United States. This appears indisputable from the acts of congress relating to the enrolment and licensing of vessels employed in the coasting trade.

By the 3d sec. of the act of the 10th February 1793, vessels which have been registered may be enrolled, and those which have been enrolled may be registered, on giving up their enrolments or registers respectively, as the case may be.

By the 4th sec. of the same act, it is made the duty of the

collector of the district containing the port to which the vessel may belong, the duty of six cents per ton being first paid, to grant in a particular form a license to such vessel to be employed in carrying on the coasting trade, for one year from the date of the license and no longer. This duty is imperative upon every collector of every district, without any regard to the moving power of the vessels. It is founded on the payment by the owner of the consideration of six cents per ton, and security against the employment of the vessel in any trade whereby the revenue may be defrauded. The license necessarily extends to the particular vessel and to all the subjects of the coasting trade, within the territory of the United States. Besides this, the vessel found trading without such license between different districts or between different places in the same district, is subjected to the same fees as foreign vessels, and if she have on board any distilled spirits, or articles of foreign manufacture, to forfeiture; 2 vol. L. U. S. 332. sec. 6. And if she proceed upon a foreign voyage without giving up her enrolment and receiving a register, the vessel and cargo are forfeited. Ib. p. 335. sec. 8.

The masters of licensed coasting vessels destined from a district in one state to a district in the same or an adjoining state on the sea coast, or on a navigable river, having on board distilled spirits, &c. not exceeding in value $800, are to make out duplicate manifests to be delivered to the collector, who shall certify the same, one of which he shall return to the master with a permit, specifying the lading on board, and authorising him to proceed to the port of his destination, subjecting the master who departs without a permit to a penalty of $100. Ib. p. 407. sec. 14.

The articles comprehended in the provisions of the foregoing sections, are most of the valuable subjects of the coasting trade.

The master of such licensed coasting vessel, must previous to unlading, deliver his manifests to the collector, &c. who shall grant him a permit for unlading, and return the manifest, indorsing a permission to proceed to the place of destination. Ib. sec. 15.

1824.

The Steam Boat Company

v.

Livingston.

Similar entries are prescribed by the 16th and 17th sections, to the masters of licensed coasting vessels destined from one district to a district other than one in the same or an adjoining state, as to manifests ; and to collectors as to permits for landing and proceeding to the port of destination.   The provisions of these acts of congress, embrace the whole coasting trade of the United States.   The duty thus prescribed to make  manifests and obtain permits, when more than the prescribed value of spirits &c. are on board, implies the right to carry all these articles under that value, and every other article in all cases ; this duty is the only restraint upon the otherwise unlimited right of trade and intercourse.

The state laws granting this monopoly, are not only repugnant to the power of congress to regulate commerce among the states, but equally so to the power to lay and collect duties of tonnage.   Constitution art. I. sec. 8.

If any one of the powers conferred by the constitution, will support the law of the union, it is enough, and every state law contravening it, is void.   The power to lay duties of tonnage is exclusive, for no state can lay them without the consent of congress, Ib. 2d paragraph.

The acts of congress for the registering and enrolment of ships and vessels, were passed long before the first grant to Robert R. Livingston, which was on the 27th of March 1798, and before that to Livingston and Fulton, which was on the fifth of April, 1803.   These grants are in open defiance of those laws ; the grant to Fitch has been repealed.

The power to enrol and license the vessels in which commerce is carried on within the respective states, is incidental and essential to the preservation of the power to raise revenue from duties of tonnage, and to guard against frauds on the revenue.   All the vessels coming within the acts of registry and enrolment, without any reference to the power by which they are moved, or discrimination in that respect, are entitled to be registered or enrolled, and thereby to have all the privileges of vessels of the United States.

The enrolment and license are founded on the payment of the duty of six cents per ton, and on the security given as to

the legal employment of the vessels. From them it follows:
1st. That the vessels thus registered or enrolled for an actual consideration paid to the government, may be used. 2d. That they may be used for every commercial purpose, whereby the revenue is not defrauded; for that constitutes the limit or restraint.

Suppose congress were to lay a duty on salt or any specific article, and for the purpose of collection to license vessels to proceed with it from port to port in the same state, could a state interdict those vessels?

Upon that doctrine of state sovereignty, which is contended for on the other side, every state in the union may establish a monopoly like the present, and thus put at defiance the laws of congress, which have been in operation almost from the commencement of the government.

And this too might be done, not for the purpose only of regulating what it is called the purely internal commerce; but for the creation of monopolies and interdictions against the letter and spirit of the acts of congress.

And then while congress license vessels for the purpose of revenue, the states might interdict the use of them and render the license futile.

The carrying of passengers for hire, is a branch of commerce. The owners of freight may be carried as well as the freight itself; and passenger ships are commercial ships.

Can the states pass laws that vessels moved by the power of wind, shall not carry passengers within their limits? If not, they can no more do it where the moving power is different. If there is a power to restrain at all, it must extend to freight as well as passengers.

The attempt to restrain is alike impolitic and useless. The only effect is to place this branch of commerce in the hands of citizens of other states.

Is it not an absurdity, that under an enrolment and license, an inhabitant of another state may trade from port to port in this state, and yet that the same right should be interdicted by an act of our legislature, to a citizen of this state having the like enrolment and license.

That enrolment and license must be as effectual in favor of an inhabitant of this state as of another.

If these state regulations are in agreement with those of congress, they are nugatory and if in opposition, they are void.

A question has been raised as to the bona fides of that trade from another state, which authorises a steam boat to enter our waters. But what right ever have we to enquire into the good faith of the voyage when if licensed by congress at all, it is without qualifications except those which regard manifests, permits, &c. Such vessels might take in an additional cargo and passengers for Albany, and at Albany a return freight for New-York. Mala fides is not predicable of this case. There is either a right to go, or no right.

It has been said, that the authority of Gibbons v. Ogden, must be restricted to the case of a vessel trading from another state to this. But that is not so ; the parties were at issue upon the validity of the state laws ; and that was the point decided.

The objection is also urged, that our construction puts the purely internal trade under the control of the congressional license and enrolment. That in this way congress may regulate the trade in Onondaga salt, and control the commerce between Albany and Schenectady ; and we are asked, " whether this power is incidental to the express power granted to regulate commerce among the several states."

I answer, that if not necessarily incidental to that power it may be to others, to that of levying duties of tonnage and excises.

All vessels above twenty tons navigating the canal must now be enrolled. Act of congress of 18th of February 1793, 9 sec.; and see the report of the committee of the House of Representatives on the exemption of canal boats.

This court has been cautioned not to go a step beyond the supreme court of the United States in annulling a state law ; and the case of Mather v. Bush in our supreme court, has been cited as a precedent for that course of deciding.

The cases are not analagous.

Here the judgment turns upon the validity of a particular

law; and upon that same law an adjudication in the court above has been had.

In Sturges v. Crowninshield, the supreme court of the United States decided with great caution, and expressly limited their judgment to the facts of that case. They saw the questions which subsequently arose.

In Mc Millan v. Mc Neil, 4 Wheat. 209. the law under which the discharge was obtained, was passed before the contract was made. It was passed in Louisiana, and both parties were now residents of South Carolina. And that circumstance probably led to the remark of the chief Justice, that the law being passed before the debt was contracted made no difference.

But the case of Mather and Bush was very different. The act was passed before the debt was contracted, and the parties were both still residents of this state. That is the case which our supreme court refused to decide in advance of that of the United States, and which has been argued and reserved for advisement at Washington.

An injunction will not be granted, when the right is doubtful; but this is more than doubtful.

Even if that part of the decree, which declares the laws void which prohibit licensed steam boats from navigating our waters, should be considered as uncalled for; still such decree has been pronounced. From the reasoning of the chief Justice, its application to the present case can never be doubted. The question is purely of law, and the decision can never be departed from, without violating the principle, stare decisis.

There can therefore, be no hope of a different result.

If the opinion of the supreme court of the United States were erroneous, it must still be followed, else there is an end of all security and of all subordination. If the powers of congress are feared, the remedy is not in state pride or jealousy, but in frequent elections and the spirit of public liberty, which can not fail to be a protection.

[Before Mr. Van Vechten should proceed, Mr. Oakley asked leave to explain his meaning as to a trade "among the states," which seemed to be treated as if he had meant the

states in their corporate capacity. He said, that was not his idea. He meant that the commerce which congress can regulate, is the trade between the territories considered as those of sovereign states; but the trade itself, is still that which the people carry on. This will authorise congress to regulate the trade from any part of one state, to any and every part of the other states.]

MR. VAN VECHTEN, also on the part of the defendant.

This bill is filed by the complainants as a corporation, claiming by assignment the exclusive right of navigating the Hudson with steam boats. It will be seen, that the claim is not coextensive with the original grant to Livingston and Fulton comprehending all the navigable waters of the state. Nor does this case fall within the act of 1811, which is mandatory upon the court, to grant an injunction, when an action is commenced at law to recover a forfeited boat, in order to prevent removal without the jurisdiction of the court.

Again: The present application for an injunction, differs from all former applications for that purpose under our steam boat laws, in another essential particular. The former applications were founded upon the basis of a clear statute right, which was then considered to be unquestionable; but, which, to say the least, is rendered doubtful by the last decision of the supreme court of the United States, in the case of Gibbons v. Ogden.

The first question which I shall examine, is, "whether that decision reaches the merits of the present case? For if it does, the injunction prayed for, must be denied.

To answer this question correctly, it is only necessary to turn to the decree which declares, "that so much of the several " laws of the state of New York, as prohibits vessels licen- " sed according to the laws of the United States, from naviga- " ting the waters of New York by means of fire or steam, is " repugnant to the constitution and void." The defendant's boat is proved to be so licensed; and hence it would seem to follow, that in the judgment of the supreme court of the United States, her right to navigate the waters of this state, can not be affected by any prohibitory acts.

But it is contended on the other side, that the decree in Gibbons v. Ogden, must be limited by the facts in that case, which did not present the question, whether a license of the United States was operative against our acts, in case of a navigation from port to port within the state.

Here let me ask, who is to determine this point? Is it competent for this court, standing in the relation of a subordinate tribunal, to narrow a decree of the supreme court of the United States, which is plain and unequivocal? Is not such decree conclusive upon this court? Can it be permitted to inquire, whether the supreme court of the United States, has not made its decree broader, than the facts in the case before it warranted? Admit for the sake of argument, that it has done so; is it in the power of this court to review and restrain the decree? Again it has been said, that the power of the supreme court of the United States, extends only to the affirmance or reversal of the judgment or decree of a subordinate tribunal. Be it so; let me ask whether it is not fit and proper, that it should give the reasons by which it is governed, and state particularly the points it means to decide, for the information and guidance of the subordinate tribunals?

What has the court done in the case of Gibbons v. Ogden? The appellant by his answer in the court below, raised distinctly the following points.

1st. That his boats being duly licensed according to the laws of the United States, to carry on the coasting trade, had a right to navigate the waters of this state; our prohibitory acts to the contrary notwithstanding, and

2d. That being a citizen of New Jersey, his right to such navigation could not be restrained by the authority of this state. In the decree, the supreme court of the United States, with equal distinctness decided both points in his favor. Wherefore, unless this court possesses a supervising power to qualify that decree, it must be conclusive upon the present application.

But it has been urged, that the chief Justice in his opinion in the case alluded to, recognises the existence of a purely internal commerce, which remains subject to state regulation. For the purpose of this argument, I concede it; but he does not define what that purely internal commerce is. It is how-

1824.
The Steam
Boat Com-
pany
v.
Livingston.

ever manifest, that he did not consider the power of regula-
ting it by a state authority, as impugning the right of any
American vessel that had her national character established by
enrolment, and had been duly licensed for the coasting trade,
to navigate the waters of every state in the union, because
the contrary is expressly declared by the decree, which it is
also understood was unanimous. This appears still clearer,
from what he says about the power of congress to regulate
commerce on the deep streams which penetrate our country in
every direction; that it must be exercised wherever the sub-
ject exists. It is a notorious fact, that many of those streams
pass through particular states; in such cases therefore, ac-
cording to the chief Justice's opinion, congress have the pow-
er to regulate commerce on those streams, within the territo-
rial limits of the particular states.

The coasting licenses are issued under acts passed profes-
sedly, to regulate the coasting trade, and if I may use the ex-
pression, to qualify the vessels to be employed in it. What is
meant by the coasting trade? It is obviously distinct from for-
eign commerce, and the complainants will readily admit, that
it is distinct from the purely internal commerce of a particu-
lar state. The correct solution of the question, I apprehend,
is significantly indicated by the very terms " coasting trade."
It can mean nothing else than the trade which is carried
on along the coasts of the United States, by the citizens and
vessels of the United States; and if this is its true meaning,
it necessarily follows, that a license, to carry it on, must be
operative co-extensively with the trade, and co-extensively
with the coasts of the United States as a nation ; including
all the deep streams which penetrate " our country in every
" direction," passing through and along particular states in
which the commerce is carried on. Have congress the pow-
er to regulate this trade? The supreme court of the United
States are of opinion, that they have ; and that it has been
legitimately exercised for many years. But admit for argu-
ment's sake, that the power is questionable ; does it not be-
long to the supreme court of the United States to settle the
question? And if that court has settled it, is not their opinion
conclusive upon this court?

1824.

The Steam
Boat Com-
pany
v.
Livingston.

The controlling power of the federal government, in cases of conflict between its laws and the laws of a particular state, has been freely admitted by our court of dernier resort, and is not a subject of doubt.    In Livingston v. Van Ingen, 9 John. 578, chief Justice Kent said, " To what extent these regulations " (the commercial regulations of the federal government) may " be carried, it is not our business to inquire.    The limits of " this power, seem not to be susceptible of precise definition. " It may be difficult to draw an exact line between those regu- " lations which relate to external, and those which relate to " internal commerce ; for, every regulation of the one will di- " rectly or indirectly affect the other."    Again he said, "when- " ever the case shall arise of an exercise of power by congress " which shall be directly repugnant to, and destructive of the " use and enjoyment of the appellants' grant, it would fall un- " der the cognizance of the federal courts, and they would of " course take care that the laws of the Union are duly sup- " ported."    But we are told now, when the supreme court of the United States has supported the laws of the Union, against the complainants' state grant, that the court has gone beyond the facts of the case before it, and this court is called upon to narrow the decision, because as is said, the defendant carries on a purely internal commerce between New York and Albany. Is this true in point of fact ? What are the facts relied on to make it out ?  New York and Albany are ports within this state, and the intermediate waters are within the state.  This is true ; but it is also true that New York is a port of entry and delivery, and Albany a port of delivery ; that New York is the place to which the produce of this state not only, but of Vermont is sent for exportation, and where foreign imports for different parts of the state are delivered ;  that passengers from Europe and the southern and eastern states, proceed in the steam boats from New York to Albany on their way to Vermont, the Canadas and the Michigan territory ; and that passengers from all these last mentioned places, come to Albany to take their passages there in the steam boats for the eastern and southern states and for Europe.    Is then the transportation of passengers, between New York and Albany purely internal commerce ? or would it be a business of purely internal com-

24

merce in the views of the constitution of the United States for steam boats to take furs from the Canadas, or the Michigan territory, or produce sent from Vermont to Albany to be forwarded to New York for exportation, or to transport foreign merchandise imported into New York, for Vermont or the Michigan territory from that city to Albany, to be forwarded thence to the ultimate places of destination ? If it is in the first case, and would be in the last, the steam boat monopoly granted by this state, enables the monopolists under a state grant, to exact their own terms, for transportation from strangers as well as citizens of the state, under the pretence, that the transportation of those strangers and their merchandise between New York and Albany, even when on the way to another state or territory, is a matter of purely internal commerce. Can a proposition so palpably unsound and untenable, be listened to for a moment ?

It is further insisted, that the power of congress to regulate the coasting trade is derived from, and confined by, the provisions in the constitution, to the regulation of commerce among the several states. Suppose this position should be conceded, would it avail the complainants ? Does not the power to regulate commerce among the several states, embrace the citizens of all the states ? Does not the constitution secure an equality of privileges to those citizens ? How is that equality maintained, when a coasting license gives to a citizen of New Jersey coasting privileges on the waters of this state, which it can not confer on one of our own citizens ? Will it be a satisfactory answer, that this is the effect of our own laws ? Does that obviate the objection, or does it not present the case of a commercial regulation by congress, which according to the complainants' claim confers on the citizens of other states greater privileges than it can confer on ours ? And if so, what follows ? The regulation being general, and the coasting licenses issued pursuant thereto being general and uniform, they must have an uniform operation, to carry into effect the expressed intention of congress. In such a case, according to the opinion of chief Justice Kent in Livingston v. Van Ingen, it belongs to the federal courts to take care that the laws of the Union are duly supported.

The fallacy of the reasoning on the other side upon this subject, will appear manifest, when it is considered that coasting licenses are grantable only to American vessels, whose national character is established by enrolment. Why is this? Because the licenses are given to confer a national privilege, in which congress did not mean that any other than national vessels should participate. What is the privilege conferred? To carry on the coasting trade of the United States wherever it exists, on all the navigable waters within the bounds of the Union.

In addition to the acts referred to by my associate counsel, to prove the fact that congress have exercised the power to regulate commerce and navigation from port to port, and from district to district, within the same state, I would call the attention of the court to the act of 24th of September 1789. The 9th section of which gives exclusive original cognizance to the district courts of the United States, of all seizures under congressional laws of impost, navigation or trade, where the seizures are made on waters, which are navigable from the sea by vessels of more than ten tons burden, within their respective districts. Is not this an unequivocal assertion of exclusive power by congress, to regulate navigation and trade on all the internal waters, which are navigable from the sea? Are not the waters of the Hudson river of this description? And if they are, does not this act conflict directly with the exclusive right of navigating those waters, with vessels propelled by force of fire or steam claimed by the complainants under a state grant? If it does, which is to prevail, the act of congress, or the grant of the state? The opinion of chief Justice Kent in Livingston v. Van Ingen not only determines the question in favor of the congressional act, but also, that the case belongs to the cognisance of the federal courts.

But it is urged, that congress have the power to regulate navigation only as a mean of carrying on commerce. Be it so; this concedes the regulating power to congress, which is all the defendant requires upon this branch of the argument. For if congress has the power to regulate the navigation of the Hudson, as a mean to carry on commerce there, that power when exercised supersedes the regulating power of this state.

1824.

The Steam
Boat Com-
pany
v.
Livingston.

And then I ask, whether the acts of congress for regulating the coasting trade and licensing the vessels to be employed in it, have not that effect? Do not all the vessels employed on the Hudson, sail under licenses issued pursuant to those acts? Nay more, do not the complainants' boats require such licenses to legalise their navigation on the waters of the Hudson, as a mean of carrying on that branch of commerce in which they are employed? and if they do, with what propriety can they set up their exclusive grant from the state to control the operation of a coasting license from the United States?

I have thus far endeavored to prove, that the defendant's right under the license from the United States, is paramount to the complainants' state grant; and that the decree in Gibbons v. Ogden is conclusive upon the subject. But suppose this point should be considered to remain doubtful, then arises another material question, viz.: Ought the injunction now prayed for, to be granted?

The general rule is not to grant an injunction in a doubtful case, and especially when it may produce an irreparable injury. 9 Johnson, 560, &c. and cases there cited. It must be conceded in this case, that the validity of the complainants' grant is rendered somewhat questionable by the decision in Gibbons v. Ogden; and that should it hereafter be adjudged invalid, the restraining of the defendant by an injunction, from running his boat in the mean while, would be productive of irreparable loss to him. For he would be completely remediless. Not so the complainants, if it is denied; because should their right be established they may recover all the defendant's earnings, and there is no suggestion of inability on his part to remunerate them. But should they apprehend any difficulty on that score, it is competent for this court to take security from the defendant to account fully, should it ever become necessary, and I am authorised by him to offer security for that purpose to the complainants' entire satisfaction.

Mr. Emmet on the part of the complainants.

The opposite counsel have accused us of endeavoring to array this state against the union. Perhaps, before the workings of our form of government had been tested by practice, such an imputation might have excited prejudice

against us. But experience and observation have convinced most reflecting men, that the attempt to array state authorities against the union, must for ever be foolish and unsuccessful. The states are a bundle of arrows easily separated. The union has always broken, and will always continue to break down state oppositions in detail. The accusation is therefore, a stale effort to excite prejudices against our cause. Surely, however, the constitution good as it is, must contain within itself, some principle of decay and mortality. It is not to be found in the capacity of the states to control and overpower the general government ; but is there no danger, that the causes of decay and death may exist in the capacity for the very opposite state of things ? Enlightened men have thought so, and have viewed the progress of the union towards consolidation with fearful solicitude. Some indeed, have called consolidation a bugbear ; but it may be well suspected, only those who wish for the event, or have not reflected on our form of government, with the page of history open before their eyes. For my own part, I have no hesitation in saying, that if the liberties of this country are to be long preserved, it must be done by upholding the rights of the states, and with the utmost respect I say it, if some of the principles laid down by the chief Justice in the case of Gibbons v. Ogden, are not overruled within twenty years, the constitution will before then have verged towards a form of government, which many good men dread, and which assuredly the people never chose.

There is a pretty general impression, that the decisions of that court on constitutional law, tend to such a result. It is the avowed opinion of Mr. Jefferson, and of many who now labor to check it. If that impression be correct, the consequences are much to be lamented ; for such a course pursued by that court, (the value and importance of which ought to be estimated most highly) may well aid in its own destruction, and possibly in that of the fabric of the government. Still, sir, let us not be misunderstood as calling on you to array yourself in your judicial capacity, against that court. If it has erred, its error can never be properly corrected by any collision with state tribunals. We have a right however, to ask, that if the

1824.

The Steam
Boat Com-
pany
v.
Livingston.

extent of its decision be doubtful, you should not presume it was intended to go beyond what you may deem to be the limits designated by the constitution. It becomes therefore, our duty to submit for your consideration, what we conceive those limits to be. Much argument has been founded on the laws of congress regulating the "coasting trade." That expression is not in the constitution, and it has not been defined by the laws of congress, or the chief Justice. He says it is well understood; I suspect, not. But let its verbal import be what it may, its signification in the laws of congress must be found by examining the powers delegated to that body. Tested by this rule, it can only mean "trade among the several states;" this our adversaries say, is to be understood as trade among the people or individuals of the several states. But the word " states" is associated in the clause of the constitution with " foreign nations," and " Indian tribes." These terms all refer to societies, each of which has a distinct political existence. The early propositions for amending the old articles of confederation, will show the idea then entertained of that trade of the states, to regulate which was one of the leading motives for forming the present constitution. On the 13th of July 1785, vid. 1 vol. Laws of United States, p. 49. Bioren's edition, congress had under consideration a report on this subject, by a committee of which Mr. Monroe was chairman. It was thereby proposed to confer on congress the power " of regulating the trade of the states, as well with for- " eign nations, as with each other, and of laying such im- " posts and duties upon imports and exports, as may be neces- " sary for the purpose." The states are here spoken of as political societies, having separate existences, and sovereign power.

What then is this trade which congress can regulate? It is that carried on from within the geographical limits of one state to within those of another. It has no relation to the trade or contracts between individuals. How can congress regulate the trade and intercourse between man and man, even though they should reside in different states or countries? Its regulations can only act on commerce as a mass, carried on between two states or nations. This trade thus defined together with foreign trade, is all that it belongs to congress to

regulate; the rest remains to the states, under the denomina-
tion of internal trade, and which it is not therefore necessary
to define.   It includes all that is not taken by the constitution
out of the general mass of commerce.   It belongs to the
states individually, not because the constitution has given it to
them; for that instrument gives nothing whatsoever to the
states; but because it appertains to sovereign power, and has
not been delegated to congress; and the grants of power
which are made to congress, so far as they may interfere with
the rights of states, are to receive the strictest construction.
1 Tucker's Blackstone, App. D. p. 154.

It may therefore be assumed as an incontrovertible position,
that congress has no authority to regulate the internal trade
of any state, and as a corollary from that position, that it can
not regulate any navigation, beginning, continuing and ending
in the same state.   The direct power is over commerce; by
force of the ancillary power vested in congress, it has made
ports and regulated seamen and vessels; so far as ships and
seamen are used in the commerce committed to its regulation,
and so far only has it authority from that clause in the con-
stitution, to regulate them.

This simple exposition would seem to mark out the just
limits of congressional power; but our adversaries contend
for something infinitely beyond them.   They insist that to
congress belongs exclusively, the entire power of regulating
navigation of all kinds, and all the navigable waters of the
union.   This is a favourite doctrine of the friends of consoli-
dation; but we utterly deny it.   The opposite counsel sup-
port it as to the regulation of navigable waters by alleging,
that the 9th section of the general judiciary act gives to the
district courts exclusive jurisdiction of maritime causes within
their respective districts, as well as upon the high seas.   The
supreme court however, have disclaimed the inference sought
to be drawn from that enactment; The United States v. Be-
van, 3 Wheaton, 336.; and indeed if that sentence gives
exclusive jurisdiction over the waters, the next following gives
it over the land of the union.   In truth, there is no pow-
er which congress can exercise on navigable waters more than
on land; so far as power is given to it over either, it is ab-

solute. This position that the powers of congress extend equally over land and water, refutes the false doctrine that it has any peculiar or exclusive legislation over navigable waters. By the act in 6 vol. laws of the United States, Bioren's ed. p. 555, sleighs and carriages are subjected, in the cases there specified, to restrictions like those applied to vessels.

The exclusive right to regulate all kinds of navigation, is contended for, on the ground that congress have actually exercised it by the different acts concerning ships and vessels, and particularly by refusing every unregistered ship or vessel, whatever may be its employment, to be enrolled and licensed. Judge Tucker clearly intimates his opinion, that those laws in some respects, transcend the powers of congress, and it would perhaps require much metaphysical subtlety to rescue them entirely from that imputation. I do not however, mean at present to controvert their validity; but to shew that, so far as regards the matter now under discussion, it depends on a very different power from that of regulating commerce. I mean the power of raising revenue. Congress has power to tax any thing; it has thought proper to tax vessels as a source of revenue; and the license serves to shew that the tax has been paid. This is the use of it in all analogous cases. During the war, we had licenses for auction sales and distilleries; we could not ride in our own carriages without licenses. Ships have hitherto occupied the chief attention of government, because they are the principal instrument of commerce, and therefore the most ready source of revenue. But in proportion as land commerce with Canada, is becoming important, sleighs and carriages are made subject to regulations; and even now revenue officers may break open houses and examine waggons and sleighs; 4 vol. laws of the United States, Bioren's ed. p. 570. 572. 575. 838. In like manner, if the facility was as great as with ships, congress might and probably would lay a tonnage duty on waggons and sleighs, and require them to take licenses showing the duty to have been paid.

A coasting license then, is only intended to show that the vessel has paid her tax; but not to give a right: and the regulations as to bonds and manifests; as to the species of goods

she may have on board, and the district from which she may have come; varying her duties and liabilities according to the variations of these and other circumstances mentioned in the law, are all regulations for the security of the revenue; they depend on a different power from that of regulating trade among the states.

As a further proof that congress regulates our internal navigation, reliance is placed on the special act permitting aliens owning steam boats in whole or in part, to employ them in a river or bay. That is only a partial repeal as to him of a previously enacted discrimination against aliens, but it confers no right except by removing a statutory disability.

The full application of the arguments urged on the other side as to the necessity of a license, and that it confers the right of navigating our waters, would enable congress to control the navigation of the interior lakes within the state territory, in opposition to a state law. The general words of the act of congress, require every vessel navigating those lakes to take a coasting license, and the steam boat on Cayuga lake is obliged to have one. If any other steam boat were to run in opposition to it, it also must take a license; and if the license gives the right to navigate wherever the water will float the vessel, the opposition steam boat may navigate that lake in violation of the state law, and by virtue of its coasting license, though it never was in sight of any port, though it never was outside our state, and certainly would not be proceeding from one port of entry or delivery to another.

Can congress, then, under the power of taxation, grant a right to interfere in the internal trade of a state, contrary to the state laws, and which it could not grant by any direct exercise of its powers over commerce? Can it grant as a reward for the payment of a tax, and as a collateral privilege, that which it has no direct power to give; and can it thus evade the limitations put upon its authority? Patrick Henry indeed anticipated that such would be the march of government, and he ridiculed as visionary the idea that any limitation would confine the powers of congress. Let the doctrine be established that it can indirectly accomplish what it is not directly permitted to do, and you are arrived at the ultimate point of the

insignificance of the state governments. You certainly have taken a vast step towards consolidation. If that can be accomplished, wherefore does the constitution make any special enumeration of powers ? If it was intended that congress should be enabled to control all commerce foreign and domestic, the grant should have been expressed in general and unlimited terms. But we have been asked, " can the state regulate the " purely internal trade of the Hudson" ? This is a bold question, which no advocate for the constitution would have dared to put, while its adoption was under discussion. If it had then been put to George Clinton, whose fears respecting the constitution are daily developing themselves to have been prophecies, what would have been his indignant answer ? If congress can regulate that trade merely carried on from port to port within a state, it may equally do so, as to all trade from village to village by land.

It is objected against us, that a state might shut up its rivers and interdict trade. To that I answer generally, that the power of a state is not a delegated power to regulate : it is the power of sovereignty, and embraces all that is not delegated to congress. But how shut them up ? We are obliged to admit foreign trade and that from other states. As to our internal trade, if we interdict it and metaphorically shut up our rivers, it can only produce inequality and hardship against our own citizens, the remedy for which is vested only in the people of the state. Congress seems to have always felt that such might be the case. From the old states no powers could be obtained, but such as they would grant. In the ordinances however, for establishing the new territories, it has taken care expressly to restrain them from stopping up their navigable waters, or interdicting the navigation to their own or other citizens. See ordinance of 1787, as to the North Western territory, and vol. 4 United States laws (Boiren's ed. p. 328.) as to New Orleans, and the several acts erecting into states Louisiana, Mississippi, Missouri and Alabama. The natural inference from the careful insertion of this restriction in their respective acts, is, that without it they would have had power to shut up their waters, at least for all purposes except foreign trade and that between the states.

Some unlucky combination of ideas induced the opposite counsel to illustrate their arguments by alluding to vessels conveying our domestic salt to different parts of the state. The instance was at least injudiciously selected ; for it is calculated to excite a train of reflections very unfavorable to the conclusions they seek to establish. It is contended, and public notice to that purport has been lately given by some collectors, that the boats carrying salt and gypsum, and plying on our canals are bound to enrol themselves and take out coasting licenses. If it be true, as contended for, that a coasting license empowers the vessel possessing it to go wherever the water will float her, in despite of state laws, that privilege must attach to canal boats as much as to steam boats. Will a license then enable canal boats to navigate our canals, without paying tolls, which are only established by state authority? But even supposing those vessels do not come under the present licensing and enrolling acts, congress may lay a tax upon them as upon other property, and grant licenses showing the tax is paid, and giving them liberty to carry on the canal trade. It may establish revenue offices and officers at Salina, Utica, Rochester and Schenectady ; may lay a tax on salt or vessels carrying it, and grant licenses for carrying salt. Upon the principles assumed by our adversaries, those vessels may go every where in defiance of state laws, and if they have any salt on board, may pass toll free with the rest of their cargo. On those principles then, congress may render our canals unproductive, or transfer to the union the entire benefit of a work which is our pride and glory, and to which we look for an ample supply of revenue. The same remarks apply to roads and all other internal improvements.

Such however is the doctrine only of the opposite counsel. The chief Justice (whatever ambiguity may be found in some parts and expressions of his opinion,) has distinctly renounced for congress the regulation of all internal trade ; and we complete our argument by adding to that renunciation, the incontrovertible position that congress nan never do that by an indirect consequence, which it can not do by a direct exercise of power. These positions are clear and certain in our favor, while our adversaries rely on some ambiguous phrases in that

1824.

The Steam
Boat Com-
pany
v.
Livingston.

opinion which they push to consequences clearly unconstitutional. We then only call upon the chancellor not to presume that the supreme court intended to decide upon a matter not before it, and in a way which we conceive and have endeavored to show would violate state rights of sovereignty.

We say this point was not before the supreme court. Our adversaries however contend it had jurisdiction of the whole question. Certainly, however, that court had no jurisdiction except of the points presented by the court of errors. The very prayer of the bill in that case, asks only for an injunction as to the waters between Elizabethtown and New York, 4 John. ch. rep. 152; and at p. 164, the chancellor confines it to the waters of New York on the passage from the city to Elizabethtown point. In 17 John. 493., is the order at length, and the decree of the court of errors, 17 John. 510, simply affirms that order. The point then, which the record presented, was the regulation of trade from New York to Elizabethtown. All the court said on any further question was extrajudicial; and even as to that, as has been already stated, whatever part of the opinion may seem doubtful, there is nothing doubtful in that part, which repudiates the claim that congress may regulate the completely internal commerce of a state. That court has never contended for the dreadfully extensive power which has been claimed here. Indeed the reserve with which the chief Justice says, " it is supposed that " the licensing of vessels from port to port of a state, is inci- " dental, &c." sufficiently expresses his unwillingness to commit himself upon that opinion. So he speaks of the laws of New York, in their application to this cause, and of a voyage from New Jersey to New York. All which shows that the court meant to adjudicate no farther than they had a right; that is, only on the case before them.

An affidavit has been produced as a surprise upon us, shewing that the " Olive Branch" touched at Jersey, where she landed a passenger, who I believe came on board again, and two cases of dry goods consigned to no one at Albany, and not delivered there, but brought back to New York. It is impossible to treat this fraud on our laws with seriousness. The opposite counsel have scarcely attempted to do so; but have

contented themselves with saying there is no fraud or mala fides in trade. There may be fraud in pretending to trade, when none is carrying on. The power of congress only extends to cases of bona fide commerce; it does not extend to protect fictitious proceedings, or those only made colorably commercial, in order to evade state laws. That this is a case of mere evasion, no one can doubt, and if Fulton and Livingston acquired any right under the state grants, it would be a reproach to jurisprudence that they should be destroyed by such an evasion.

To conclude ; is our right doubtful ? The laws giving it are explicit. The state tribunals have settled, that under them we have a clear right : those laws and decisions should govern every subsequent case, unless where they have been clearly over ruled by the supreme federal court. On the facts of this case it has never decided, and never can decide at all, unless the state tribunals adjudge in our favor. If the injunction be refused, we never can go to that court ; if it be granted, the other party may carry the appeal through all its stages. Indeed, if I could bring myself to apprehend that, that high tribunal would ever lay down as constitutional law that congress can either directly or indirectly, regulate the internal trade of a state, as a citizen, I should feel a strong desire to present that question for their decision in its most simple shape, naked and unencumbered with any other matter ; and looking to the future welfare of the country, I would say, if such a decision is to be made, the sooner it is made the better.

We are accused of seeking to work upon state pride ; but to talk of state pride is to undervalue what we contend for. It is upon state rights we stand, and state rights are state liberty. They are more ; they are in this land the bulwarks of individual and personal liberty ; they are the outposts of the constitution. While they are preserved entire, our federative union will stand against the shocks of time, and the approaches of despotism ; but let them be broken down or suffered to moulder away, and a consolidated power must succeed in governing this mighty empire : Consolidation will be the euthanasia of our constitution. Make that consolidated government as democratic and free as you please, make its base as broad and its principles as liberal as philanthropy and phi-

1824.

The Steam
Boat Com-
pany
v.
Livingston.

losophy can devise ; it will still be a single government over a vast extent of territory ; it will follow, it will surely and speedily follow the course of all the governments of ancient times and modern Europe, which began with elective rights and free institutions, but have silently sunk into despotisms.

Mr. Henry begged leave to correct what he conceived to be an error of the counsel as to the decree appealed from, which was of May term 1821. The decree alleged by Mr. Emmet had been subsequently modified. Mr. Emmet adhered to his positions and referred to the reports and pleadings.

June 14.

The Chancellor took time to consider the question till this day ; and now gave judgment.

The exclusive right granted by this state to Robert R. Livingston and Robert Fulton, to navigate all waters within its jurisdiction, with boats moved by fire or steam, so far as that right comprehends navigation of the Hudson between the cities of New York and Troy, is now vested in the north river steam boat company.

The defendant is the possessor of a steam boat named the Olive Branch ; and the bill states, that this boat is now employed by him, in navigation and the transportation of passengers, between the cities of New York and Albany and intermediate places, in violation of the exclusive right of the complainants. Upon this bill, the complainants ask an injunction to restrain the defendant from navigating the Olive Branch between the cities of Albany and New York.

On the part of the defendant, it appears, that the Olive Branch has been enrolled, and has a license for carrying on the coasting trade.

The courts of this state have heretofore determined, that the exclusive grant to Livingston and Fulton, is in all respects, valid. One of the decisions made by the highest court of this state, declaring that grant valid, has been recently reversed, by the supreme court of the united states : and the opinion and decree of the supreme court, are now before this court, as they are before the public.

The facts constituting the case of Gibbons against Ogden, decided by the supreme court, were, that two steam boats, ha-

ving licenses for the coasting trade, were employed in navigation between a port in New Jersey and a port in this state. The supreme court has decided, that these boats were authorised to pass from one state to the other, and for that purpose, to navigate the waters of this state, notwithstanding the grant of this state to Livingston and Fulton. That court has determined, that the exclusive grant of this state is void, against steam vessels having licenses for the coasting trade, when such vessels arrive in this state from another state, and when they proceed hence to another state. This was the direct question before that tribunal; this question has received a direct decision; and I do not perceive, that any proposition more comprehensive, has been determined by the supreme court.

In the opinion given by the supreme court, the effect of a license for the coasting trade is discussed, and its efficacy, in respect to a voyage from one state to another, is determined : but the same opinion considers the act concerning the coasting trade, as an exercise of the power of the congress to regulate commerce among the states; and it admits the distinction between commerce among the states, and the internal commerce of a particular state. If a license confers a right to navigate from state to state, this proposition decided the cause between Gibbons and Ogden, and rendered the decision of any other question, unnecessary. If indeed, a license gives a right to navigate from one place to another in all cases, and as well where the voyage is wholly in the same state, as where it is partly in different states, this proposition would also have decided that cause ; but this proposition has not been announced, while the right to navigate from one state to another, has been distinctly adjudged. It is not supposed, that the supreme court intended to adjudge the grant of this state null, to any extent greater than was necessary for the decision of the cause before it.

No court of justice can intend or desire, that the reasons given for its decision, should be disjoined from the facts before it, and the question which it is bound to decide. An exposition of the reasons of a court, is justly referred to the case before it; its arguments and all its expressions, are considered as used in application to the facts of the case, and to some ul-

1824.

The Steam Boat Company v Livingston.

timate proposition which the court plainly affirms or expressly denies.

The decree and the opinion of the supreme court then determine, that the grant of this state to Livingston and Fulton, is invalid, in respect to navigation between this state and any other state, by vessels licensed for the coasting trade. This seems to me to be the result of all the views of that court; the only conclusion which it intended to deduce from all its arguments and illustrations.

The grant to Livingston and Fulton having been adjudged valid in its full extent, by the highest tribunal of this state; and being now adjudged void, in respect to navigation between this state and any other; I might briefly declare, that navigation within the state, by steam vessels not arriving from or proceeding to another state, remains subject to the grant of the state and former decisions establishing its validity. But in the existing posture of this controversy, a conclusion so technical and summary, would not be sufficient: and I must examine those questions of the controversy, which, in its present state, are really new and demand a new decision.

Since the existing government of the union has been in operation, the greater part of its revenue has been levied by duties on imports; another portion of its revenue has been raised by duties on the tonnage of vessels: and the laws of the united states, have blended revenue, commerce and navigation, very intimately with each other.

When revenue is raised from commerce, the measure acting on the subject taxed, becomes in a greater or less extent, a regulation of commerce itself, as well as a measure of revenue. Such is often the intention of the legislature; but the same legislature having also a distinct power to regulate commerce, may exercise it, with views entirely distinct from revenue.

*Navigation is subject to the control of the laws of the United States, not directly as such, but only as an instrument of commerce, or as an object of taxation.* Navigation is an instrument of commerce; and as such, it may be regulated by a power competent to regulate the commerce, in which it is employed. Vessels are also subject to taxation; and thus, commerce may be indirectly regulated, by taxing one of its instruments. The commerce in which vessels are employed, may be taxed; the vessels employed may be specifically taxed; and taxes of both kinds, may con-

cur. In any of these cases, the tax and proper regulations for its collection, have, to some extent, the effect of commercial regulations.

Commerce may then be regulated directly, without taxation, and indirectly, by taxation; but these methods differ widely from each other. When commerce is regulated by taxation, the result is produced, not by establishing rights of commerce, but by imposing burdens. These burdens, while they produce revenue, also produce other consequences. They may also operate upon foreign commerce, upon domestic commerce, upon internal manufactures, and upon various branches of industry. Many great interests are, or may be affected, by these burdens; and the consideration of such effects, is embraced in the views of public policy, which induce the legislature to impose the tax. But all such results are, still, mere consequences, which in the course of political economy, flow from the operation of a tax. The legislature establish the tax, and leave it to produce the indirect consequences which may follow from its operation. Such laws are, in their positive enactments, merely revenue laws.

Provisions to enforce the due payment of the tax, are also necessary; and regulations for this purpose are made, sometimes in the law imposing the tax, but usually, by other distinct laws. These laws control the commerce taxed, for the sole purpose of enforcing the collection of the tax; they regulate the commerce merely to restrict it; and the regulations for collection, are also revenue laws, in their enactments.

When complex regulations, apparently embracing revenue, commerce and navigation, are to receive an interpretation, the true sense of such regulations may be elucidated, by inquiring whether they are intended to raise revenue and to regulate commerce indirectly and so far only, as may be necessary for the main purpose of revenue, or to regulate commerce directly, for purposes distinct from revenue, and in virtue of another power.

The first exertion of the taxing power of the union, was to impose duties on merchandise imported from foreign countries; and the next was, to impose duties on the tonnage of vessels. Duties on tonnage, were imposed by an act of the twen-

26

1824.

The Steam Boat Company v. Livingston.

tieth day of July, 1790. By that act, vessels of the united states, employed in trade between one part of the united states and another, are taxed by a duty of six cents on each ton, upon each entry or voyage, with some exceptions; but where the vessel has a license to trade between the different districts of the united states, or to carry on the fisheries, this duty is paid only once a year.

ulations, either of revenue or of commerce; or, whether they affect either of those objects in a consequential and indirect manner only.

The law concerning the coasting trade, now in force, was passed on the eighteenth day of February, 1793. It is a body of provisions, which upon a first view, seem to result, not wholly, from any one of the specified powers of the congress. Most of its regulations, are evidently traced to the power to collect duties and imposts; in some respects, it may rest upon the power to regulate commerce with foreign nations; and in some others, it may regulate commerce among the states.

The act of 1793, regulating the coasting trade, is a body of provisions resting in some measure, upon each of the different powers of congress to collect duties and imposts, to regulate commerce with foreign nations, and to regulate commerce among the states.

In enacting the law concerning the coasting trade, one great object of the congress, was, to exclude foreign vessels from commerce between the different parts of the united states. The marine of this country is a great arm of national strength; to cherish it, has been a high object of national policy; and this law was intended to promote that object, by giving the navigation employed in the coasting trade, and the benefits of that navigation, exclusively to citizens. A vessel to be registered or enrolled, must, except in a few cases, be built within the united states; and must in all cases, be wholly the property of citizens of the united states. The first section of this law enacts, that vessels enrolled and licensed, and no others, shall be deemed vessels of the united states, entitled to the privileges of vessels employed in the coasting trade: and the sixth section subjects vessels which are neither registered nor enrolled and licensed, and found trading between any two places in this country, to forfeiture in some cases, and in others, to the fees and tonnage imposed on foreign vessels.

One great object of that law, was to confine the coasting trade to vessels owned by citizens of the United States, and to exclude foreign navigation.

The coasting trade is confined to vessels of the united states; and they are either registered vessels or vessels enrolled and licensed. Both registered vessels and licensed vessels possess the same great qualifications, construction within the united states, and property wholly in citizens: but while both these classes of vessels have an equal right to the coast-

The coasting trade may be, and is carried on, both by registered vessels which have no license, and by vessels enrolled and licensed.

ing trade, they do not participate in it, on terms of equal advantage. Registered vessels are charged with the duty of six cents a ton, on each coasting voyage, while licensed vessels, usually performing numerous voyages in the course of a year, are subject to this duty, only as an annual tax. The difference of tonnage duties charged on vessels of the two classes, is the sole reason, that registered vessels are less employed in the coasting trade, than licensed vessels; and even under a duty more burdensome, a portion of the coasting trade, is performed by registered vessels. In the different duties, consists the advantage which licensed vessels have over registered vessels in the coasting trade. A privilege is a peculiar advantage, an immunity: and the privileges of vessels licensed for the coasting trade, consist first, in the exclusion of foreign vessels, an advantage which is common to licensed vessels and registered vessels; and next, in the advantage given to licensed vessels over registered vessels by a lower duty. These are the privileges of licensed vessels; the peculiar advantages which they enjoy over all other vessels: and these are the privileges of licensed vessels, intended by this law.

Another great object of the law concerning the coasting trade, was, to provide, that this trade should be conducted with security to the revenue. Duties on imports, had already been imposed; and a system of collection adapted to importations on their first arrival in the ordinary course of foreign commerce, had been established. But the coasting trade takes place by sea, and along all the coasts of the united states; it takes place from the sea to internal waters; it conveys through all the internal waters of the country, foreign merchandise subject to duties; and without suitable restrictions, this trade would afford easy means of evading the duties on imports. The regulations adapted to the collection of duties upon importations arriving in the regular course of foreign commerce, were inapplicable to the coasting trade, and did not profess to control it. The coasting trade was therefore placed under the control of the officers appointed to collect the duties on imports; and it was subjected to such restrictions as were deemed necessary for the security of the revenue. Most of the regulations of the coasting trade, are clearly adapted

sed; but the duties are so regulated as to confer an advantage on the latter; and this advantage together with the exclusion of foreign vessels, is the privilege intended by law, in favor of licensed vessels.

The enjoyment of this privilege, the security of the tonnage duty to government, and the guarding of the revenue laws against evasion, are the objects of the laws for the regulation of licensed vessels. But these regulations are limitations of a pre-existing right, and not a grant of any right or authority to carry on the coasting trade.

The Steam
Boat Com-
pany
v.
Livingston.

to this and no other object. The bonds, manifests, reports, oaths, permits and minute details, which form so great a part of the provisions of this law, are obviously intended to prevent evasions of the duties on imports. The security taken, that the vessel shall not be employed within two years in any trade by which the revenue shall be defrauded; the oath taken by the master, to the same effect; the various provisions concerning foreign merchandise subject to duty; the different regulations provided for different cases, manifestly because the danger to the revenue, is in some of those cases greater, and in others less; all, show, that the object of these various provisions, is to secure the revenue.

Such, were the great and general purposes of this law; and all its provisions are adapted to these objects.

*Registered vessels which have no license, participate in this trade.*

The national character of a vessel, as built in this country and belonging to citizens of the united states, is the essential qualification for the coasting trade; and that character is ascertained by the register or by the enrolment. But this is not the sole qualification required for vessels entitled to all the privileges of the coasting trade. After the enrolment and before a license can issue, the tonnage duty must be paid; the bond concerning the use of the license, must be given; and the oath of the master that the license shall not be abused, must be taken. When these requisites have taken place, the license is issued. It is an official certificate, that there has been a due compliance with those requisites of law, which succeed the enrolment, and are preliminary to the license; and it completes and declares the qualifications of the vessel, for engaging in the coasting trade, with the privileges which have been mentioned.

Another great object of the license, is to subject the vessel, wherever found, to the effectual control of the laws and the public officers. The license is intended to accompany the vessel, and to be in possession of the master, who has taken an oath concerning its use; he is bound to exhibit it to any officer of the revenue, upon demand; and it is limited to one year, because the tonnage duty on these vessels, is payable annually, and for the sake of the control and security, which

are afforded by a new bond, a renewed oath and a new license.

Thus, the objects of the license, are, to give an official proof of the facts which it recites ; to declare the vessel fully qualified for the coasting trade and its privileges ; to secure the payment of the annual tax on the vessel ; and to provide an effective control over an employment, which greatly exposes the revenue from imports, to evasions and frauds : and these seem to be the sole objects, which the legislature contemplated, as ends of the license.

But it is said, that the license is also, a commission or authority ; and so considered, it is a commission to carry on the coasting trade. The license itself, gives no definition of the coasting trade.

What is the coasting trade intended by this law ? As opposed to foreign commerce, and distinguished from commerce by land, these words may be sufficiently definite ; but in all other respects, they are vague. The restrictions to which the coasting trade is subjected, afford an indirect description of some particular operations, to which those restrictions are applied ; and in no other respect, is the coasting trade defined. But for the purposes of this law, greater accuracy was not necessary. When this law was enacted, an unrestrained freedom of intercourse between the states and all parts of the nation, existed ; and the object of the congress, was, to regulate and limit that freedom, by restrictions upon navigation, intended to promote the maritime strength of the nation and to secure the revenue. The coasting trade intended, was therefore a commerce then existing without restraint ; it was lawful commerce ; such commerce as then was or might afterwards be carried on, according to laws which the congress or the states, in virtue of their respective powers, might enact. As no impediment to free intercourse, existed, none was removed. Hence, the coasting trade and the fisheries, received no definition. Hence, registered vessels were left, as they are left to this day, with a right to carry on the coasting trade, resting on the freedom to navigate and trade, in every manner not prohibited. Hence, the right of registered vessels in this respect, is recognised by the act concerning the coasting trade ;

*1824.*

*The Steam Boat Company v. Livingston.*

*What is the coasting trade, is not in terms, defined by these laws, nor in the license ; and the definition is only to be gathered from the restrictions in the laws. But it is a trade, the right to which was not given by those laws ; the right was perfect before, and is only regulated by them.*

but is not declared or treated as a right given by that act. But the coasting trade and the fisheries were subjected to certain regulations : and if those regulations can have full and consistent effect as limitations, it would be against all reason, to consider them as a grant of rights.

When any intercourse is regulated, it is supposed, that the intercourse will or may take place. The fact of an intercourse existing or expected, is recognised by a regulation concerning it : and the regulation may either declare and define the right of intercourse, or it may merely impose restrictions, without giving any new right to the intercourse itself.

Laws for the collection of revenue, give rights and impose obligations ; but the rights are given to the government, and the obligations are imposed on the citizen. The various regulations made to enforce the collection of taxes, consist of methods, checks and sanctions, giving auxiliary rights to the government, and imposing farther obligations upon persons, and upon things taxed or used in an employment taxed. The due collection of the revenue, being the purpose of such regulations, they are authorities to the public officers, while to the citizen, they are restraints upon his conduct.

*Laws for the collection of revenue, except to the government.*

*On the citizen they operate only as restrictions.*

A restriction intended to control the exercise or prevent an abuse of a right, is not a grant of that right. An example will illustrate. The laws require, that goods subject to duty, shall not be landed from the vessel importing them, without a permit. This regulation implies, that the goods may be landed with a permit ; but the right of the owner to land them, is not conferred by this restriction. That right is derived from another source, from the laws of property ; and it may be variously modified by the laws which give and govern the right. The permit to land the goods, indeed, gives a special right against the public and the revenue officers. It declares that the duties have been paid, and removes from the case, the operation of the revenue laws ; it gives that exemption from the operation of a law, which results from a compliance with its requisites : and if such an exemption is denominated a right, it is a right of mere exemption, which does not determine the nature or extent of any other right. The regulation requiring that goods shall not be landed without a permit, and every

purpose for which it is established, are fully satisfied by this construction. While therefore, such a restriction supposes a right or a freedom to exist, it gives neither; and still less, can it be considered a grant of a definite and absolute right of commerce. Numerous regulations of revenue, navigation and commerce, are entirely of this character.

1824.

The Steam Boat Company v. Livingston.

Such also, are the regulations of the act concerning the coasting trade. This law is a system excluding foreign vessels from the coasting trade, and subjecting the citizens of the united states, to restrictions in their pursuit of this employment. It leaves the right of the citizens to this employment, where that right was found by this law; that is to say, upon the basis of a free and open occupation, a right to do all things not forbidden by the laws.

An act of the second day of March 1819, makes some new regulations and removes some of the restraints upon the coasting trade between states, imposed by the former law. This act illustrates the questions now considered, as it shows an intention not to give or to take away rights of commerce, but simply to remove impediments, by dispensing with certain restrictions of the law of 1793.

The provisions concerning the coasting trade, have effect in this state, as in all other states of the union; and considered as regulations confining the navigation employed in the coasting trade, to citizens of the united states, and subjecting that navigation to restrictions for the security of the revenue, there is no conflict between them and the grant to Livingston and Fulton. Steam vessels are as fully subject to these provisions, as vessels of any other description; and all steam vessels in this state, whether navigated under the state grant or in opposition to it, are equally subject to their operation. The steam vessels navigated under the grant to Livingston and Fulton, have always conformed, as they were bound to conform, to all these restrictions.

It is only when this law is considered as granting a right of commerce, that any collision between it and the right granted by this state, can be found.

That terms so indefinite as the words, coasting trade, should have been used for the purpose of establishing rights of com-

The law regulating the coasting trade, considered as operating to confine the navigation to citizens, and to protect the revenue, is not in conflict with the exclusive grant made by this state to Livingston and Fulton, for navigating steam vessels. Those steam vessels are e-

1824.

The Steam-Boat Company v. Livingston.

qually subject to the regulations of the coasting trade.

merce, between different parts of the nation, is not probable. That this should have been done without any known motive, when a full freedom of intercourse, both by land and water, existed among all the states, is a supposition still more improbable. To expound these terms of this law, thus made, as a grant of rights, when its provisions have a direct application to other objects, and when all those provisions have full effect, as restrictive regulations, would be a construction widely distant from the apparent intention of the legislature. To construe a license for the coasting trade, as an express grant of an absolute right to navigate from one place to another, in all cases, is to extract a right by inference, from regulations and restrictions which do not declare any such right, and is to give to a right so inferred, the same force and precision, which the most clear and affirmative terms expressly granting such a right, could bestow. Still more without reason, is such a right inferred from the license, when registered vessels have the rights of the coasting trade, and yet have no license.

If, however, the law concerning the coasting trade, is considered a regulation of commerce among the states, it can operate only upon that commerce, and can not invade the internal commerce of a state. Navigation is subject to the powers concerning commerce, only because it is an instrument of commerce ; and where the congress can not regulate a commerce, it can not regulate the navigation which is merely instrumental in the prosecution of that commerce. So far then,

So far as the law regulating the coasting trade, rests upon the power to regulate commerce among the states, it is inoperative as regards the internal commerce of each state; and the exclusive grant to Livingston and Fulton, being now reduced by the decision of the supreme court of the united states, to the

as this law may rest upon the power to regulate commerce among the states, it can not touch navigation employed in an internal commerce, which does not concern other states.

The grant to Livingston and Fulton, is no longer exclusive in respect to other states. As every licensed vessel arriving from another state, may now enter our waters or may depart from them to another state, the grant has ceased to operate upon other states, and upon commerce among the states. Navigation between this state and others, by steam vessels having licenses, being entirely free, every interest which other states can have in this question, is satisfied.

What collision remains ? The grant to Livingston and Fulton now operates only upon this state, and excludes all, excep-

ting those who hold the grant, from a particular employment within the state, when that employment does not affect the commerce of other states. If the grant, now reduced to this limit, affects the commerce or interests of other states, many other laws of the state, not yet impeached, are far more seriously in collision with commerce among the states. Sales by auction, are confined to a few persons appointed by the state; an important revenue is derived from this species of commerce; and this regulation has an indirect effect, upon other states having commerce with or through this state. The tolls imposed on our canals and roads, are charges upon transportation, falling in a considerable degree, upon citizens of other states. The health laws of the state are a real and great impediment to commerce. Laws like these, which may operate remotely and minutely upon other states, can not be subverted by the power of the congress to regulate commerce among the states. A vessel moved by steam, may be accelerated or retarded in its course by the winds; and the employment of such a vessel in navigation between two points in the same state, may remotely have some slight effect upon commerce with other states; but influences so accidental and insignificant can neither deprive the vessel of its essential character of a machine moved by steam, nor give to its employment the character of being engaged in commerce among the states.

But when this law is considered as emanating from the taxing power of the congress, the distinction between commerce among the states and the internal commerce of a state, ceases to perplex the inquiry. To a great extent, this law clearly results from the taxing power; and if the security of the revenue, is the main object of the act, all its particular provisions may be justly considered, as resulting from the same source, and as auxiliary to that great object. Thus understood, this act regulates navigation in some particulars, in order to secure the revenue; it regulates that navigation, whether it is employed in the internal commerce of a state, or in commerce among the states; and it regulates commerce in these particulars, only in the manner in which, laws for the collection of revenue from commerce, operate upon commerce, the subject taxed.

*Margin notes:*

1824.

The STEAM BOAT COMPANY v. LIVINGSTON.

limits of the purely internal commerce, there is no longer any collision.

State laws operating directly upon legitimate subjects of state regulation, but which at the same time, indirectly and consequentially, affect other states, do not therefore, so affect the commerce among the states, as to encroach upon the power of congress to regulate that commerce.

But if the law regulating the coasting trade, is considered as a revenue law, it may then operate for that purpose, upon purely internal trade; and if it affects commerce among the states, it is only indirectly and consequentially.

27

1824.

The Steam
Boat Com-
pany
v.
Livingston.

If this law can be considered in any respect, an exercise of the power of the congress to regulate commerce among the states, it certainly must be understood as regulating the internal commerce of a state, in no other manner, than to subject the vessels employed in it, to restrictions, in pursuance of the power to lay and collect taxes. These restrictions are not grants of right; and they are not regulations of commerce, in any sense excepting that, in which all laws for the collection of taxes charged upon commerce, may be termed commercial regulations. They are regulations of commerce, only as regulations for the due collection of taxes on agriculture or manufactures, would be regulations of agriculture or manufactures. A law proceeding from the taxing power of the union, may operate upon vessels employed in commerce merely internal, as it may operate upon every thing within the scope of that power. But the taxing power, clear and absolute as it is, has its due course and effect, without annulling state laws. Every exposition of the constitution, from the days of the convention to this time, has truly taught, that the taxes of the union and laws for their collection, do not extinguish state laws, but operate concurrently with them.

And thus understood, it is not incompatible with any state law: both laws may operate upon the trade at the same time, and neither excludes the other. Steam vessels may navigate under the exclusive grant; but they must also conform to the laws of the United States.

When this law is thus understood, it usurps no power of a state over its internal commerce, and it operates to subject all vessels employed in a coasting trade wholly within a state, to certain restrictions. These restrictions, and the power of the state over its internal affairs, are perfectly compatible with each other. The restrictions of this law, and a law of the state, may both operate upon vessels employed in a coasting trade confined to the state; and neither law excludes or interferes with the operation of the other.

The provisions concerning the coasting trade between ports in the same state, are then, restrictive regulations; and not grants of rights. The vessels employed in such voyages, are subject to the legislation of the state; and the grant made to Livingston and Fulton, does not dispense with or defeat any restriction imposed on the coasting trade carried on between ports in this state.

The right to navigate from state to state,

Navigation between this state and any other, by steam vessels licensed for the coasting trade, having been adjudged a

right; and navigation by steam vessels merely from one place to another within this state, being still subject to the state grant; both these rights must have effect, so far as they are compatible with each other. When these rights really interfere, the right granted by the state must yield, and the right to navigate between any port in the state and another state, must prevail.

A steam vessel having a license, and entering this state from another, may proceed to any port in this state; and such a vessel may depart from any port in this state, and proceed to another state. In either case, the vessel may touch at any intermediate place within the state. These rights are either expressly adjudged by the supreme court, or follow as direct consequences from the principles of its decision.

The navigation which remains subject to the state grant, is that which takes place between any two points in this state, where the voyage is not a continuation of a passage to or from another state. Such a voyage is equally subject to the right granted by the state, whether it is between two places in the same revenue district, or between places in different revenue districts within the state. This right is not affected by the limits of revenue districts, or the obligations of masters of vessels in respect to manifests, oaths, reports and permits, in different cases. All those regulations of the coasting trade, have their due effect; but they do not vary the right to navigate from place to place. This question has no concern with ports of entry or ports of delivery; it having no connexion with foreign commerce, or with the entry or delivery of foreign merchandise upon its arrival in the united states.

Thus, the points at which a voyage commences and terminates, seem to me to determine, whether the voyage is protected by the license, or is subject to the state grant: and I do not perceive, that these rights can be reconciled in practice, by any other discrimination. A steam vessel having a license, and proceeding from a port in this state, may indeed, by touching at a port in an adjoining state, continue the voyage to any other port in this state; and it is urged, that such a navigation between two ports in the state, would be an evasion of the state grant. But the intention with which a vessel may be

1824.

The STEAM BOAT COMPANY v. LIVINGSTON.

under the laws of the united states, and the exclusive right to navigate from a port to port within this state, under the state grant, must both have effect, so far as they are compatible: and when not so, the state right must yield.

A steam vessel having a license, and entering this state from another state, may proceed to any port in this state, and may depart from any port in this state, to another state; and in either case, may touch at any intermediate port in this state.

The navigation which thus remains subject to the state grant, is not affected by the limits of revenue districts; nor by the regulations regarding ports of entry and delivery.

The termini of the voyage, fix its character as respects its being subject or not, to the state grant; and thus a steam vessel by

1824.

The Steam Boat Company v. Livingston.

navigated to another state, can not, I think, repel or destroy the right, which the same vessel now has, to proceed from another state to any port in this state. The right to navigate to or from another state, is now, an established and absolute right, notwithstanding the state grant; and this absolute right may, I conceive, be exercised for the purpose of continuing a voyage made from or to another state, to any other port in this state.

The particular case now before the court, is a voyage made by the Olive Branch from the city of New York to the city of Albany. On the part of the defendant, it is shown, that two boxes of merchandise intended to be transported to the cities of Jersey and Albany, were taken on board of the Olive Branch at the city of New York; that the vessel having also passengers, proceeded first from the city of New York to the city of Jersey on the western shore of the Hudson; that some passengers were there landed, the vessel being then fastened to a wharf at that place; and that the vessel proceeded thence, to Albany. The whole Hudson being in this state, it is insisted by the complainants, that the Olive Branch, while at the city of Jersey, was still within this state, and that the communication which took place at the city of Jersey, was not a voyage to or from the state of New Jersey. The Olive Branch was not in New Jersey, but approached the line of the two states, as nearly as such a vessel could approach; and did so, for the purpose of an intercourse with New Jersey, which actually took place. As it was impossible that this vessel should there pass by navigation, from this state into New Jersey, and as an actual intercourse with that state took place, in the only manner in which intercourse between the two states by navigation, is there practicable; this seems to be a case of navigation from state to state, according to the sense and spirit of that decision, which has determined that a license for the coasting trade, confers a right to navigate from one state to another.

Upon these facts, an injunction is denied.

---

*The Steam Boat Company v. Livingston. touching at a port in another state, may be enabled to continue her voyage within this state; and the intention with which such vessel may have touched at the other state, can not destroy her absolute right thus to navigate within this state.*

*In this case, the defendant's steam vessel, the Olive Branch, having touched at the city of Jersey and landed goods and passengers, had a right to proceed from thence to any port in this state; and though the waters of the Hudson to the shore of New Jersey, are within this state, yet touching there and so trading, are an intercourse in the only manner there practicable, and the case is substantially a case of navigation from state to state.*